E-FILED
Wednesday, 03 March, 2010  10:56:45 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| **RUBBERMAID INCORPORATED,** | ) | Case No. 09 CV 1395 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | JUDGE MICHAEL M. MIHM |
| | ) | |
| **ROBERT BOSCH TOOL CORPORATION**, | ) | MAGISTRATE JUDGE JOHN A. GORMAN |
| | ) | |
| AND | ) | |
| | ) | |
| **BARRY L. MACLEAN**, | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| **J. FRED RISK** | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| **DAVID P. RANSBURG** | ) | |
| | ) | |
| AND | ) | |
| | ) | **PLAINTIFF'S FIRST AMENDED** |
| **LRN HOLDING, INC.,** | ) | **COMPLAINT FOR MONEY** |
| | ) | **DAMAGES, EQUITABLE RELIEF,** |
| AND | ) | **AND OTHER RELIEF** |
| | ) | |
| **JOHN AND JANE DOES,** | ) | |
| | ) | [JURY DEMAND ENDORSED HEREON] |
| Defendants. | ) | |

Plaintiff, Rubbermaid Incorporated, by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 15(a)(1)(B),which permits the filing of an amended complaint without leave of court within 21 days after service of a motion under Rule 12, for its First Amended Complaint against defendants Robert Bosch Tool Corporation, Barry L. MacLean, J.

Fred Risk, David P. Ransburg, LRN Holding, Inc., and John and Jane Does alleges and avers as follows:

## NATURE OF THE ACTION

1.     With full knowledge of Plaintiff's contract, claim and pending lawsuit against L.R. Nelson Corporation, the officers, directors and shareholders of L.R. Nelson Corporation conveyed substantially all the assets of the corporation to third parties pursuant to asset purchase agreements.  In exchange, the company received millions of dollars which are now gone.  These insiders made sure that virtually every employee was hired, nearly every contract was assumed, the bank debt in excess of $29 million was paid off, and virtually every vendor and creditor of the corporation either had its debts assumed or satisfied by the purchasers.  All liabilities, that is, except the amounts owed to plaintiff Rubbermaid Incorporated. After these transactions, L.R. Nelson Corporation changed its name to LRN Holding, Inc. and has proceeded to wind up its affairs as an insolvent shell. This result fulfilled LRN's earlier threats, that if Rubbermaid did not compromise its claim, the insiders would bankrupt the company and render it an insolvent shell against which Rubbermaid would be unable to collect.

2.     Having made good on its threat and conveyed away substantially all of the corporation's assets and rendered the company an insolvent shell, LRN has failed to make any payment on the $2.75 million judgment entered against it in favor of Rubbermaid.  Instead, the company's insiders directed the corporation to convey more than $5 million to the insiders (rather than satisfy Rubbermaid's claim) at a time when the corporation was insolvent.  These transfers were fraudulent conveyances which must in equity and/or by statute be unwound and the assets recovered, attached or judgment in the amount of such transfers rendered against the individual insiders having directed and received such transfers.  Moreover, the conduct of these

officers, directors and shareholders is actionable as both fraudulent and in violation of these individuals' duties to the creditors of an insolvent entity.  Subsequent to these transactions, and since September 18-19, 2008, defendant Ransburg, with the acquiescence and encouragement of defendants Risk and MacLean and perhaps other shareholders, has dominated and controlled LRN, and misused the corporate form, such that LRN is now merely his alter ego. Under applicable law, the corporate veil of LRN should accordingly be "pierced" in order to hold Ransburg, Risk and MacLean liable jointly and severally with LRN for the Rubbermaid judgment.

3.       Furthermore, the strategy to evade the debt of Rubbermaid and to convey the corporation's assets to insiders was facilitated and agreed to by defendant Robert Bosch Tool Corporation which now operates the business of L.R. Nelson Corporation, with the exception of the insubstantial "Turf division" (the assets of which were sold to someone else), uninterrupted ("the LRN Business").  Robert Bosch Tool Corporation is a successor-in-interest to the judgment debtor, rendering it too liable for such judgment to Rubbermaid.  Robert Bosch Tool Corporation is also liable for the amount of the judgment, among other theories, on the basis of aiding and abetting fraudulent conveyances as it participated in transfers of the debtor's assets at a time when the debtor was insolvent, for the bad faith purpose of evading the company's debt to Rubbermaid.

## THE PARTIES

4.       Plaintiff Rubbermaid Incorporated ("Rubbermaid") is an Ohio corporation with its principal place of business in Huntersville, North Carolina.

5.       Defendant Robert Bosch Tool Corporation ("Bosch") is a Delaware corporation with its principal place of business in Mount Prospect, Illinois.

3

6.     Defendant LRN Holding, Inc., formerly known as L.R. Nelson Corporation, ("LRN") is being joined as a defendant because its presence in this action may be necessary to obtain complete relief on Rubbermaid's claims. LRN is a Delaware corporation with its principal place of business in Peoria, Illinois.

7.     Barry L. MacLean ("MacLean") is an individual who resides in the state of Illinois and has, at all relevant times, been a director and shareholder of judgment debtor LRN.

8.     J. Fred Risk ("Risk") is an individual who resides in the states of Florida and/or Indiana and has, at all relevant times, been a director and shareholder of judgment debtor LRN.

9.     David P. Ransburg ("Ransburg") is an individual who resides in the state of Illinois, and has, at all relevant times, been an officer, director and shareholder of judgment debtor LRN.

10.    John and/or Jane Doe ("Doe(s)") are collectively those individual(s) whose identities are presently unknown to Rubbermaid and whose presence in this action would not destroy diversity, and who were at all relevant times officers, directors and/or shareholders of judgment debtor LRN, and who may be liable to Rubbermaid on the same theories as those asserted herein against Ransburg, MacLean, and/or Risk.

11.    For purposes of brevity, Ransburg, MacLean, Risk and/or Doe(s) will be referred to sometimes herein collectively as the "Insiders."

## JURISDICTION

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

4

13.     This Court has personal jurisdiction over MacLean and Ransburg as residents of the state of Illinois. 735 ILCS 5/2-209(b)(2).

14.     This Court has personal jurisdiction over Bosch as a corporation doing business in the state of Illinois.  735 ILCS 5/2-209(b)(4).

15.     This Court has personal jurisdiction over Risk pursuant to the Illinois long-arm statute as a director and shareholder of a corporation with its principal place of business in Illinois and in connection with claims asserted for breaches of his duties as a shareholder and director of such corporation, as well as on many additional bases under the long-arm statute.  735 ILCS 5/2-209(a)(1), (2), (7), (10), (11), (12). His contacts with Illinois for purposes of this action are more than sufficient to satisfy due process.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2).

## GENERAL ALLEGATIONS RELEVANT TO ALL COUNTS

### LRN Enters Into a License Agreement with Rubbermaid And Conceals That LRN is Already Facing A Solvency Crisis and its Ability to Pay Royalties is Questionable From the Outset

17.     Rubbermaid is the owner of certain trademarks which have substantial value, including the "Rubbermaid" name and logo.

18.     LRN was engaged in the business of manufacturing and selling sprinklers, nozzles, timers and related products for watering lawns and gardens and for cleaning products (the "Business").

19.     In the Fall of 2005, Rubbermaid and LRN negotiated the terms of a License Agreement pursuant to which Rubbermaid granted LRN the right to use its intellectual property in connection with the sale of certain LRN products in exchange for royalty payments. LRN and

Rubbermaid entered into the License Agreement on October 7, 2005 (as amended, the "License").

20.     The License provided for Guaranteed Minimum Periodic Royalty Payments for the term of the agreement as follows:  $150,000.00 in 2006, $1,100,000.00 in 2007, $1,100,000.00 in 2008, and $1,100,000.00 in 2009. (License, Schedule C.) The License further provided that these Guaranteed Minimum Periodic Royalty Payments "are fully earned by [Rubbermaid] upon execution of the [License]." (License, Section 5.2.) Moreover, "if the [License] is terminated for any reason, all Guaranteed Minimum Periodic Royalty Payments not yet paid by [LRN] must be paid to [Rubbermaid] within twenty (20) days after the effective date of the termination." (License, Section 5.2.)  The License also required LRN to pay interest on any past-due royalty amounts "at the greater of (i) eighteen percent (18%) per annum) or (ii) the maximum interest rate permitted by law." (License, Section 5.4.)

21.     LRN therefore contractually obligated itself in October 2005 to pay Rubbermaid at least $3,450,000.00 in minimum royalties over the three-year term of the License, and agreed that such minimum royalties were fully earned by Rubbermaid as of October 2005.

22.     LRN's executives and officers, including without limitation Chris Colwell, Ted Lueken, Bill Gassman, and Dave Eglinton, made multiple representations to Rubbermaid in September and October of 2005 that LRN was financially able to perform under the License.

23.     LRN refused, however, to provide Rubbermaid with full financial reports on the premise that LRN was a privately held company and did not provide financials.   LRN therefore limited its written financial disclosures to those contained on its Application to be a Rubbermaid Licensee which was submitted on September 8, 2005.  The Licensee Application did not provide

any indication that LRN was experiencing any financial difficulty or would have any problem in satisfying its royalty obligations under the License.

24.     LRN concealed from Rubbermaid that at the very same time as LRN was providing this limited financial information and was entering into the 3-year License with fully earned royalty obligations to Rubbermaid in excess of $3 million, LRN was retaining the professional services of a workout specialist.

25.     In the Fall of 2005, LRN retained Silverman Consulting ("Silverman"), because LRN was experiencing severe financial troubles and needed to find a new lender who would loan to a financially troubled company.

26.     Silverman is a Chicago-based consulting firm that serves financially troubled companies and helps turn around or sell businesses that are experiencing financial difficulty.

27.     Beginning in or about the Fall of 2005, LRN was unable to continue to borrow on a traditional basis and needed to replace its existing lender. With Silverman's workout assistance and advice, on January 25, 2006, LRN entered into an asset-based lending relationship with Wells Fargo Foothill, Inc. ("Wells Fargo").

28.     LRN was forced in January of 2006 to borrow from Wells Fargo, and other lenders for whom Wells Fargo acted as agent, pursuant to asset-based loans, because LRN did not have the creditworthiness or credit ratings at that time that would enable it to borrow on a more traditional basis.

29.     Wells Fargo required Ransburg to personally guarantee LRN's obligations under the Wells Fargo loans and/or to pledge his personal assets as collateral for the loans.

30.     Several months later, on or about April 27, 2006, LRN entered into a real property loan agreement with National City Bank ("NCB") pursuant to which LRN granted liens and encumbrances on its real property in favor of NCB.

31.     On or about June 1, 2006, the president of LRN's consumer products division, Chris Colwell, wrote to Rubbermaid seeking to amend the License to reduce the minimum royalties due for 2007 from $1.1 million to $750,000.00, claiming that Rubbermaid had prevented LRN from launching certain of its royalty products effectively in 2007 and therefore needed an accommodation on its minimum royalty obligations for 2007 only.

32.     LRN concealed from Rubbermaid that it was experiencing financial difficulties and was simply unable to pay the 2007 royalties, and instead asserted the claim that Rubbermaid had prevented LRN from launching covered products, even though LRN knew this was not accurate.

33.     Unaware of the real reasons for LRN's requested royalty reduction, Rubbermaid agreed to amend the License and on June 20, 2006, entered into the First Amendment to the License Agreement, which reduced LRN's 2007 royalty obligation by $350,000.00. In all other material respects, LRN's royalty obligations under the License remained unchanged.

34.     On or about September 29, 2006, LRN's primary shareholder, chairman, and Chief Executive Officer, defendant David Ransburg, entered into a Subordinated Promissory Note with LRN.  Pursuant to the terms of this "note" LRN obligated itself to pay Ransburg $4 million on December 31, 2006 (the "2006 Ransburg Investment").

35.     Under Ransburg's control, LRN also granted Ransburg a security interest in its assets to secure the 2006 Ransburg Investment.

36.     There was no UCC filing reflecting this grant of security interest for the 2006 Ransburg Investment at the time the $4 million investment was made in September, 2006.  Any purported security interest granted in 2006 in favor of Ransburg was therefore unperfected and did not represent a "valid lien" as defined under the Uniform Fraudulent Transfer Act, because any such unperfected lien would not be effective against the holder of a subsequently obtained judicial lien.  See, e.g., 740 ILCS § 160/2(m); 6 Del. C. § 1301(13).

37.     As of January 2007, the only payment made by LRN pursuant to the License was a $150,000.00 payment made in 2005 as payment for 2006 royalties.  With minimum royalties coming due for 2007 in March, LRN started to raise pretextual quality issues regarding certain equipment, tooling and inventory that LRN had agreed to purchase in the First Amendment to the License.  LRN used these complaints about quality to support its demand that the prices for such equipment, tooling and inventory be reduced by Rubbermaid.

38.     On or about March 7, 2007, LRN's Colwell again wrote to Rubbermaid demanding a reduction in amounts owed for the equipment and inventory, and claiming that due to these allegedly defective products and Rubbermaid's alleged misrepresentations as to their real value, "LRN will be unable to make sales sufficient to pay the minimum royalties or meet the marketing and sales targets required under the [License] for 2007 and 2008."

39.     LRN concealed from Rubbermaid that it was experiencing serious financial trouble and that it was unable to pay the minimum royalties because of these financial difficulties. Instead, LRN created a pretext of and exaggerated the equipment and inventory claims in an effort to induce Rubbermaid to reduce LRN's royalty obligations yet again.

40.     Rubbermaid balked at LRN's requested second amendment of the License.

41.    On March 23, 2007, Rubbermaid filed a complaint for breach of the License in the United States District Court for the Northern District of Ohio, captioned:  *Rubbermaid Incorporated v L.R. Nelson Corporation*, Case No. 07-CV-00875 (N.D. Ohio 2007)(the "Ohio Action").

42.    From March 2007 until July 31, 2007, LRN and Rubbermaid negotiated a possible resolution of their disputes, the Ohio Action, and LRN's proposed second amendment to the License.  In the course of these negotiations, Rubbermaid requested that LRN provide some collateral for LRN's minimum royalty obligations, particularly since Rubbermaid was again being asked to reduce the amounts owed.  LRN refused to provide such collateralization.

43.    Nevertheless, and in order to induce Rubbermaid to agree to another amendment, LRN's President and Chief Operating Officer, Dave Eglinton, wrote an email to his counterpart at Rubbermaid on or about May 23, 2007, saying: "I give you my personal assurance that L.R. Nelson Corporation will not seek any further concessions or reductions in royalties or obligations under the License Agreement."

44.    Unbeknownst to Rubbermaid, during the same time period LRN was refusing to provide collateral to Rubbermaid, LRN was granting security interests in all of its assets to two of its directors and shareholders:  Risk and MacLean.

**While Insolvent and Defaulting on Royalty Obligations Owed to Rubbermaid,  LRN Enters Into Agreements for the Benefit of Its Insiders, Including Granting Liens on LRN's Assets**

45.    On or about June 5, 2007, LRN, under the control of its officers, shareholders and directors, entered into a Subordinated Promissory Note obligating LRN to pay Risk $2 million, plus interest, on the maturity date of May 31, 2009 (the "Risk Investment").

46.     On the same day, LRN, under the control of its officers, shareholders and directors, also entered into a Subordinated Promissory Note obligating LRN to pay MacLean $2 million, plus interest, on the maturity date of May 31, 2009 (the "MacLean Investment").

47.     The terms of the "notes" reflecting the Risk Investment and the MacLean Investment provided for each of Risk and MacLean to initially advance LRN $1 million on June 5, 2007.  Risk and MacLean were each further obligated to advance an additional $1 million to LRN on October 1, 2007.

48.     The terms of the "notes" also provide for interest to be paid at a rate of 6.5% above the 30-day LIBOR rate, an interest rate which is well above commercially reasonable rates that would have been negotiated by LRN with an arms'-length lender as opposed to a preferred insider.

49.     On or about June 5, 2007, LRN, under the control of its officers, shareholders and directors, entered into a Security Agreement granting a lien on certain of LRN's assets to secure the Risk Investment and the MacLean Investment.  Such liens purportedly attached to LRN's equipment, machinery, furniture, tangible personal property, accounts receivable, inventory, and the proceeds of such assets.

50.     Risk and MacLean also filed UCC-1s which reflect LRN's grant of this security interest.

51.     Upon information and belief, Wells Fargo was unwilling to lend LRN an additional $4 million on June 5, 2007, and/or the terms under which such additional funds would have been loaned were unacceptable to the Insiders.

52.     Upon information and belief, LRN was unable to identify any third party or arm's-length lender who was willing to lend LRN $4 million on June 5, 2007, and/or the terms under which such additional funds could have been loaned were unacceptable to the Insiders.

53.     In June, 2007, LRN was not generally able to pay its debts as they became due.

54.     In June, 2007, LRN's liabilities were greater than all of its assets at fair valuation.

55.     LRN was insolvent or was rendered insolvent on June 5, 2007, when it granted its security interests in favor of Risk and MacLean.

56.     Risk and MacLean were aware on June 5, 2007, that LRN was insolvent or would be rendered insolvent in connection with the grants of security interests in their favor.

57.     Risk and MacLean were aware on June 5, 2007, that Rubbermaid had sued LRN for damages and that LRN had a firm contractual obligation for minimum royalties already earned by Rubbermaid in excess of $3 million under the License.

58.     The Ohio Action was pending when Risk and MacLean made their investments in LRN and when LRN granted Risk and MacLean security interests in the amount of $4 million total.

59.     Risk and MacLean were aware that the Ohio Action was pending in June, 2007.

60.     Because Ransburg, and perhaps MacLean and Risk also, had personally guaranteed the Wells Fargo loans and/or had pledged personal assets as security for the Wells Fargo loans, they were all concerned in June, 2007, about LRN's ability to repay its loans to Wells Fargo and NCB, which are believed to have exceeded $25 million as of June 2007.

61.     As of June 5, 2007, Ransburg, Risk and MacLean were aware that LRN intended to seek a purchaser and to be sold as a going concern. They were also aware that LRN was insolvent.

62.     Ransburg, Risk and MacLean believed that the most effective way to avoid any personal liability on any personal guarantees and/or pledges of personal assets to Wells Fargo and/or NCB was to keep LRN operating until it could be sold for a maximum value as a going concern.

63.     Ransburg, Risk and MacLean believed that the best way to reduce their personal exposure and to realize their investments as shareholders in LRN was to keep LRN operating until it could be sold for a maximum value as a going concern.

64.     Risk and MacLean understood that it was unlikely that LRN could repay their investments unless the company was successfully sold.

65.     Ransburg, Risk and MacLean knew that they would be unable to take a liquidating distribution from LRN at the time of the anticipated future sale without creating liability for themselves, because LRN was already, and would continue to be, in default on the significant Rubbermaid obligation.  Ransburg, Risk and MacLean therefore characterized their investments as loans, rather than the capital contributions that they were.

66.     Ransburg, Risk and MacLean also understood that they could be liable to LRN's bona fide creditors if they were to be paid at the time of the anticipated future sale even on "loans," if those loans were unsecured.  Risk and MacLean therefore directed LRN to grant them liens on LRN's assets to secure the Risk Investment and the MacLean Investment and sought to perfect such liens with UCC filings.

67.     Risk and MacLean structured these investments as secured loans with the intent of hindering, delaying or defrauding LRN's unsecured creditors, including Rubbermaid.

68.     On June 8, 2007, Ransburg filed a UCC-1 reflecting the grant of a security interest for the 2006 Ransburg Investment.  Ransburg failed to perfect any purported lien granted

to him in September, 2006, and instead tried to create the impression of a perfected secured lien of $4 million, in June, 2007.

69.     Ransburg structured his 2006 Investment as a secured loan, and perfected his purported lien granted in connection with such "loan" in 2007, with the intent of hindering, delaying or defrauding LRN's unsecured creditors, including Rubbermaid.

70.     LRN's grant of purported security interests to Risk, MacLean and Ransburg on or around June 5, 2007, were "transfers" under the applicable Uniform Fraudulent Conveyance Act. See, e.g., 740 LCS 160/2 (l); 6 Del. C. § 1301(12).

71.     These transfers of security interests to the Insiders in June, 2007, are avoidable fraudulent transfers.

72.     Because the Insider's liens granted in June, 2007, are avoidable, they do not constitute "valid liens" on LRN's assets under the applicable Uniform Fraudulent Conveyance Act.

73.     Risk, MacLean and Ransburg wanted LRN to retain all of its business contracts and options to be available for any interested buyer of LRN's assets.  LRN would also be more attractive to a potential purchaser if it was not the subject of a judgment in excess of $3 million in favor of Rubbermaid. Therefore, after the June, 2007, investments of Risk and MacLean, LRN pushed to resolve the pending disputes and to enter into a Second Amendment to the License.

74.     LRN did not disclose any of these intentions to Rubbermaid.

75.     The Ohio Action was dismissed without prejudice on July 12, 2007.

76.     LRN and Rubbermaid entered into the Second Amendment to the License on July 31, 2007.  The Second Amendment extended the term of the License for one year and reduced LRN's minimum royalties for the original term by $900,000.00, and then increased royalties

commencing in 2010 to recoup the up-front losses.  The Second Amendment provided that in the event that LRN failed to timely pay the minimum royalties as reduced, all amounts owed would revert to the amounts owed in the original 2005 agreement and royalties for the remaining term would be accelerated and immediately due. Although the Second Amendment provided some accommodations to LRN and reduced the minimum royalties somewhat, LRN's firm obligation to Rubbermaid for fully-earned minimum royalties under the Second Amendment was still in excess of $3 million.

77.    LRN was aware when it negotiated the reduction in its existing royalty obligations that within the year it would either be sold or be in bankruptcy.  LRN therefore had no concerns about the acceleration provisions or other breach provisions, because LRN believed those obligations would either be some other company's problem or would be addressed in bankruptcy.

78.    LRN, of course, quickly started to breach its obligations to pay royalties as owed under the amended License.

79.    On or about October 4, 2007, Wells Fargo required Ransburg to collateralize his personal guaranty by granting a security interest in a Ransburg personal brokerage account located at a Wells Fargo affiliate, Wells Fargo Brokerage Services, LLC.

80.    On or about November 16, 2007, LRN's President and COO, Dave Eglinton, wrote Rubbermaid apologizing for failing to make weekly payments as they became due or to clear up past due amounts.  Eglinton promised Rubbermaid that this was a temporary problem and that LRN would soon be paying Rubbermaid on time.

81.     LRN was unable to pay its obligations as they became due in 2007.  LRN's liabilities were greater than all of its assets at fair valuation in 2007.  LRN was insolvent in 2007. The Insiders were aware that LRN was insolvent in 2007.

82.     By at least January of 2008, and perhaps earlier, LRN was officially being marketed for sale.  LRN did not disclose this material fact to Rubbermaid in January of 2008.

83.     On January 16, 2008, LRN and Ransburg entered into an agreement with Windlake Capital Advisors, LLC ("Windlake") to retain Windlake as an investment banker to shop LRN to prospective buyers.  Ransburg signed the agreement with Windlake in both his individual capacity and as the "owner and CEO" of LRN.

84.     On January 24, 2008, Rubbermaid gave LRN written notice of its breach for failure to pay royalties as they became due under the License.

85.     Due to LRN's ongoing financial decline and insolvency, on February 26, 2008, LRN and Wells Fargo entered into a First Amendment to Amended and Restated Forbearance and Eleventh Amendment to Credit Agreement. Wells Fargo was forbearing in early 2008, from exercising it rights as a secured lender and holder of personal guarantees and/or pledges granted by the Insiders on a total debt believed to be in excess of $25 million.

86.     On February 26, 2008, Ransburg granted Wells Fargo a personal guarantee of LRN's obligations in the amount of $1.6 million.

87.     Unbeknownst to Rubbermaid, LRN was frantically trying to sell the Business as a going concern to satisfy Wells Fargo and NCB, to eliminate the Insiders' personal guarantees and pledged collateral obligations, and to repay all of its Insiders on their investments.

88.     Because LRN was in default again on its royalty obligations, Rubbermaid again sued LRN on March 12, 2008, to recover damages for breach of the License in the U.S. District

Court for the Western District of North Carolina in a case captioned: *Rubbermaid Incorporated v. L.R. Nelson Corporation*, Case No. 3:08-cv-00100 (W.D.N.C.) (the "North Carolina Action"). LRN's exposure on Rubbermaid's claims, considering only its exposure for fully-earned minimum royalties under the License, was in excess of $3 million. LRN's exposure was substantially more than that when all damages and interest Rubbermaid was entitled to recover for LRN's breaches were taken into account. It was highly likely as a result of the North Carolina Action that Rubbermaid would eventually obtain a judgment against LRN in excess of $3 million.

89.     In response to the filing of the North Carolina Action, LRN and Rubbermaid commenced negotiations to have LRN commence weekly payments or make some other accommodations for the amounts past due and coming due.  The settlement negotiations ultimately broke down in April, 2008, because LRN would not agree to a requirement of Rubbermaid that if LRN stopped making the negotiated required payments, Rubbermaid would be entitled to an agreed judgment against LRN in the amount of $3,173,500.00.

90.     At this same time, in March, 2008, and unknown to Rubbermaid, multiple LRN management employees who were negotiating with Rubbermaid entered into Stay Bonus Contracts with LRN to induce them to stay with LRN until the Business was sold.  Such key employees included Dave Eglinton, Ted Lueken, Gary Bartholomew and Chris Colwell.

91.     On March 31, 2008, LRN was obligated under the "notes" related to the Risk Investment and the MacLean Investment to repay each of Risk and MacLean $1 million.

92.     LRN did not pay Risk or MacLean the $1 million owed under their respective "notes" on March 31, 2008.

93.     Risk and MacLean did not seek to enforce the terms of their "notes" or to foreclose on their purported liens on LRN's assets in March, 2008.

94.     LRN was generally unable to pay its obligations as they became due in 2008. LRN's liabilities were greater than all of its assets at fair valuation in 2008.  LRN was insolvent in 2008.  The Insiders were aware that LRN was insolvent in 2008.

95.     A judgment in favor of Rubbermaid and against LRN in the principal amount of $2,750,000.00, plus interest, was entered in the North Carolina Action effective May 11, 2009 (the "Judgment"). (A copy of the Judgment is attached hereto as Exhibit 1.)  LRN agreed to this Judgment in order to avoid the approaching May 2009 trial and what LRN then knew was highly likely to be a much larger judgment in favor of Rubbermaid as a result of that trial. The Judgment is a valid and binding federal court judgment for the payment of money.

96.     The Judgment was registered and filed in this federal district court on August 24, 2009, under Case No. 09-CV-1053.

97.     Rubbermaid therefore holds a valid and recorded judgment lien against LRN in the amount of $2.75 million plus interest.

98.     No payment has been made on the Judgment. LRN has represented to Rubbermaid that no money is available to satisfy the Judgment. Indeed, as discussed more fully herein, LRN has transferred substantially all of its assets to Bosch, has ceased operations, and has used the proceeds of the Bosch transaction and other proceeds to pay the Insiders and other favored creditors, leaving Rubbermaid to chase an insolvent corporate shell with no intention or present ability to satisfy the Judgment.

99.     Since Rubbermaid obtained its judgment in May 2009, Ransburg has caused LRN to obstruct Rubbermaid's legitimate post-judgment discovery and collection efforts.  Ransburg

and his counsel have repeatedly insisted that Ransburg received nothing in the Bosch transaction and have refused to produce most of the requested documents.

100.    Rubbermaid's requests for documents and other evidence concerning the transactions and matters discussed herein -- including documents concerning liens, transfers, payments, "loans," "security interests," the Bosch/LRN transaction, and the like – have been met with delay and obstruction by LRN and Ransburg. Such documents were formally requested pursuant to post-judgment written discovery served on LRN on July 2, 2009, but very few of the requested documents have been produced by LRN or Ransburg.

101.    Because such documents and evidence are peculiarly within the knowledge and control of LRN and Ransburg, and these parties have wrongfully refused to produce such documents and evidence to Rubbermaid, Rubbermaid is at this time able to identify only certain challenged transfers and to provide some specific facts underlying Rubbermaid's claims. Rubbermaid expects that full and proper discovery will further substantiate Rubbermaid's claims.

102.    Some of the specificity in this Amended Complaint is in part due to documents Rubbermaid recently obtained from court filings made by Bosch and/or LRN in litigation between those two parties pending in Illinois state court concerning the LRN/Bosch Escrow account, including the sworn deposition testimony of Ransburg and his lawyer John S. Elias, as well as multiple documents and communications which reflect facts alleged herein. The sworn testimony in the LRN/Bosch Escrow litigation is in conflict with representations that Ransburg and his counsel have been making to Rubbermaid since at least February, 2009, and have made in the North Carolina Action and most recently in LRN and Ransburg's Motion to Dismiss filed in this Court on February 8, 2010.

103.    For example, Ransburg has represented to Rubbermaid, and he filed an affidavit in the North Carolina Action on October 16, 2009, that stated that he "received <u>no</u> cash payment from the proceeds of either the Bosch transaction or the Signature transaction." In fact, as alleged more fully below, Ransburg personally received at least $695,000.00 on or about March 6, 2009 from the Bosch transaction, as his own counsel ultimately acknowledged under oath in his deposition filed in the LRN/Bosch Escrow litigation. Ransburg has also caused his lawyers at Elias, Meginnes, Riffle & Seghetti to misrepresent to Rubbermaid material facts bearing upon Rubbermaid's Judgment and its collection efforts.

### While Litigation is Pending, LRN Conveys Away Its Assets as Threatened

104.    After the North Carolina Action was filed in March of 2008, LRN and Rubbermaid engaged in negotiations regarding the amounts owed and possible options for resolving Rubbermaid's claims.

105.    On July 17, 2008, Dave Eglinton advised Rubbermaid that LRN was working on possibly selling the company and stated that an undisclosed prospective buyer was requesting to review the License to better understand the extent of the company's liability to Rubbermaid under the License. Rubbermaid consented to a waiver of the License's confidentiality provisions so that the undisclosed prospective buyer could review its terms.

106.    On or about August 2, 2008, in the course of discussions to address Rubbermaid's claims, LRN's president and COO, Dave Eglinton, informed Rubbermaid executives Sam Atchison and John Holz in a telephone conference call, that if Rubbermaid would not compromise its claims and write off its claimed minimum royalties, LRN would simply bankrupt the company and leave it an empty shell that would be judgment proof and Rubbermaid would not collect anything.

107.    Refusing to acquiesce to such threats, Rubbermaid continued to prosecute its action, unaware that LRN was then engaged in efforts to do just as it threatened.

108.    On August 15, 2008, LRN entered into its Seventh Amended and Restated Forbearance Agreement and Seventeenth Amendment to Credit Agreement with Wells Fargo. Thus, in LRN's brief lending relationship with Wells Fargo commencing in January, 2006, the parties amended and restated the agreement at least *17 times*.

109.    In August, 2008, LRN was unable to pay its obligations as they became due.  In August, 2008, LRN's liabilities were greater than its assets at fair valuation.  LRN was insolvent in August, 2008.  The Insiders were aware that LRN was insolvent in August, 2008.

110.    Fulfilling the plan to sell the Business, on or about September 18-19, 2008, while the North Carolina Action was pending and being prosecuted, and a judgment against LRN in that action in excess of $3 million was highly likely, LRN entered into two agreements to convey away substantially all of its assets.

111.    On September 18, 2008, LRN entered into an agreement with Bosch, hereinafter the "LRN/Bosch Agreement," pursuant to which LRN agreed to sell to Bosch substantially all of LRN's assets, rights and properties used in the conduct of its Business. *See* LRN/Bosch Agreement at Section 1.1.  More specifically, the LRN/Bosch Agreement defines the "Purchased Assets" as including the following assets of LRN, and its wholly-owned subsidiaries, Sunterra, LLC ("Sunterra"), and Nelson Ningbo Gardening Equipment Company Ltd. ("Nelson-China"): (i) substantially all of the assets of the Consumer Products division of LRN; (ii) substantially all of the assets of the Sunterra division of LRN; (iii) substantially all of the assets of LRN and its affiliates located in Ningbo China; and (iv) LRN's real property in Peoria, Illinois. The LRN/Bosch Agreement is voluminous, contains information alleged by LRN to be confidential,

and is believed to be already in the possession of all of the defendants. It is therefore not being attached to this Amended Complaint now. It will be submitted to the Court under seal upon the entry of an appropriate protective order or as may otherwise be agreed between the parties.

112.    On the next day, LRN entered into a separate agreement with Signature Control Systems, Inc., a California corporation ("Signature Control"), to convey substantially all of the assets comprising LRN's relatively insubstantial Turf Division.

113.    In exchange, LRN received consideration in excess of $50 million from Bosch and an additional $4,781,000.00 from Signature Control.

114.    Bosch paid a base price of $50 million which included paying off LRN's bank debt of $29.1 million, paying off certain vendor liabilities in the amount of $11.9 million, and assuming additional vendor liabilities to be paid off in March, 2009, in the amount of $1.2 million.  (*See* LRN/Bosch Agreement Schedules 1.3(b), (c), and (d).)

115.    In fact, Bosch satisfied or assumed virtually every liability of LRN necessary for the conduct of the LRN Business and made an additional cash payment to LRN of an unknown amount.  (LRN/Bosch Agreement § 1.3.)

116.    Bosch specifically agreed to assume:  "all obligations of [LRN] under all leases, licenses, agreements and contracts included in the Purchased Assets and all other liabilities and obligations of the Business and the real property included in the Purchased Assets." (LRN/Bosch Agreement § 1.3.)

117.    Bosch thus assumed LRN's bank debt, vendor liabilities, accounts payable, real estate taxes for its Peoria facility, and all obligations under *all* of LRN's contracts (with the exception of the License).  (*Id.*)

118.    Bosch also acquired the right to use the "L.R. Nelson" name and other marks of LRN. Accordingly, on or about September 30, 2008, L.R. Nelson Corporation changed its name to "LRN Holding, Inc."

119.    Bosch is a direct competitor of companies that are corporate affiliates of Rubbermaid.

**Due to Issues with Chinese Regulators, LRN is Forced to Close the LRN/Bosch Transaction in Stages, with LRN's Nelson-China Assets Not Being Sold or Paid For Until March, 2009**

120.    LRN and the Insiders were eager to close the transactions with Bosch and Signature Control on September 18 and 19, 2008, due to mounting pressure from Wells Fargo and NCB, the insolvency of LRN, and the Insiders' concerns about eliminating their guarantee and pledged collateral obligations and without further exposing their equity investments or being forced to contribute more capital to enable LRN to operate.

121.    Unfortunately for these parties, the ability to close on LRN's Nelson-China business was delayed because of issues concerning Chinese regulations and other matters.

122.    LRN, Bosch, the Insiders, and Wells Fargo were thus forced to decide how to proceed with the global purchase agreement when certain LRN assets in China ("LRN's Nelson-China Assets"), included in the defined Purchased Assets, could not be conveyed to Bosch on September 18, 2008.

123.    Bosch insisted that in exchange for the amounts to be paid on September 18, 2008, *all* liens on the Purchased Assets must be released even though all assets were not being transferred to or paid for by Bosch on that date.

124.    Therefore, in order for the primary transactions with Bosch and Signature Control to close as scheduled on September 18 and 19, 2008, certain parties holding liens or purported liens on the Purchased Assets were required to release their liens prior to LRN being paid by

Bosch the full consideration agreed upon for the Purchased Assets, and, in the case of LRN's Nelson-China Assets, at least 3 months before LRN was paid by Bosch.

125.    Specifically, Bosch agreed to pay, and LRN agreed to accept, approximately $2.3 million of the Purchase Price for LRN's Nelson-China Assets when those assets were conveyed to Bosch after Chinese approval was obtained and other matters for that part of the deal were finalized. LRN and the Insiders expected that the closing on LRN's Nelson-China Assets ("the China Closing") would occur, and these funds would be paid by Bosch, in or about December 2008. However, as addressed more fully below, the China Closing did not happen until March 6, 2009.

126.    Ransburg used his personal lawyer at Elias, Meginnes, Riffle & Seghetti, John S. Elias, to handle the China Closing, and paid for such services with the company's funds.

127.    On or about September 18, 2008, Risk and MacLean were each paid $1 million. They were demanding to be paid an additional $1 million each, plus interests and costs associated with the Risk Investment and the MacLean Investment.

128.    When Risk and MacLean were each paid $1 million in September, 2008, they received transfers of LRN's assets that were not subject to a valid lien held by Risk or MacLean. Risk and MacLean did not hold valid liens on such assets, because the security interests granted to them on June 5, 2007, were avoidable fraudulent transfers.

129.    The transfers of LRN's assets in 2008 to Risk and MacLean also were not subject to valid liens, because they "secured" equity investments rather than valid loans and for this reason as well the purported "liens" should be avoided and negated.

130.    Wells Fargo was demanding to be paid a pre-payment penalty for being paid in full on September 18, 2008, and was willing to have $735,000.00 of that penalty paid at the China Closing.

131.    Risk, MacLean, Ransburg, and Wells Fargo entered into an Intercreditor Agreement on or about September 16, 2008, pursuant to which they agreed who would be paid from which proceeds and how parties would be protected after releasing all of their real or purported liens against the Purchased Assets (which included LRN's Nelson-China Assets and their sale proceeds).

**The Insiders Release Their Liens On the Purchased Assets and Their Sale Proceeds, And Thereby Release All Security Interests in LRN's Nelson-China Assets and Proceeds**

132.    Risk, MacLean and Ransburg agreed on or about September 16, 2008, to release any and all security interests, liens or other interests that each of them held in the Purchased Assets (which included LRN's Nelson-China Assets and their sale proceeds).

133.    Risk, MacLean and Ransburg agreed on or about September 16, 2008, that they would each release their liens in the Purchased Assets and would consent to payment of the sale proceeds from such assets to any person, including, without limitation, any unsecured creditor.

134.    On or about September 16, 2008, Risk, MacLean and Ransburg thus expressly agreed that they no longer had any security interest in LRN's Nelson-China Assets or in the proceeds of the sale of such assets that were to be received by LRN as a result of the China Closing.

135.    On September 23, 2008, Risk filed a UCC amendment releasing any and all security interests, liens or other interest that Risk held or purported to hold in the Purchased Assets (which included LRN's Nelson-China Assets and their sale proceeds).

136.     On September 23, 2008, MacLean filed a UCC amendment releasing any and all security interests, liens or other interest that MacLean held or purported to hold in the Purchased Assets (which included LRN's Nelson-China Assets and their sale proceeds).

137.     On September 23, 2008, Ransburg filed a UCC amendment releasing any and all security interests, liens or other interest that Ransburg held or purported to hold in the Purchased Assets (which included LRN's Nelson-China Assets and their sale proceeds).

138.     Risk and MacLean were reluctant to release their real or purported liens on the Purchased Assets, because they realized LRN already was, or would render itself, insolvent after consummating the LRN/Bosch transaction and the LRN/Signature Control transaction on September 18 and 19, 2008.

139.     Risk and MacLean knew that the only assets remaining after the deals closed would be contingent and/or unliquidated assets that would be potentially difficult for them to collect on. Risk and MacLean knew that the only easily collectible assets remaining after September 18, 2008, were LRN's Nelson-China Assets, which were to be conveyed by LRN and paid for by Bosch at the China Closing, and the Turf Receivables (as defined below).

140.     Considering themselves insecure, Risk and MacLean demanded that Ransburg personally guarantee that they would be paid the remaining amounts owed on the Risk Investment and the MacLean Investment, which then exceeded $2 million in total.

141.     On September 18, 2008, Ransburg executed personal guarantees in the amounts of $1 million each in favor of Risk and MacLean as substitute collateral for the liens they released on the Purchased Assets (including LRN's Nelson-China Assets and their sale proceeds).  Ransburg also executed a Security Agreement to collateralize his personal guarantiys,

which granted Risk and MacLean a security interest in Ransburg's personal funds on deposit with JPMorgan Chase Bank, N.A. and/or Wells Fargo Brokerage Services.

142.    In September, 2008, Risk and MacLean thus traded their purported and recorded liens on the Purchased Assets (including LRN's Nelson-China Assets and proceeds), for liens on Ransburg's personal assets.

### The Insiders Benefit in the Transactions Which Renders LRN Insolvent, to the Direct Detriment of LRN's Legitimate Creditor Rubbermaid

143.    Each of the Insiders was required to authorize the transactions with Bosch and Signature Control.

144.    Each of the Insiders was aware at the time of the Bosch transaction and the Signature Control transaction that LRN was insolvent or would be rendered insolvent by the sale of substantially all of its assets.

145.    Each of the Insiders received in Illinois transfers of LRN's assets in connection with the Bosch transaction and/or the Signature Control transaction. These transactions were all consummated at least in substantial part in Illinois.

146.    As previously indicated in paragraph 127, on or about September 18, 2008, defendant MacLean received in Illinois $1 million in cash from the sale proceeds of the Bosch transaction.

147.    The $1 million payment to MacLean on September 18, 2008, was not made with assets that were subject to a "valid lien" as defined under the applicable Uniform Fraudulent Conveyance Act. See, e.g., 740 ILCS 106/2(m); 6 Del. C. § 1301(13).

148.    Any purported liens granted to MacLean in June, 2007, or otherwise, are avoidable as fraudulent and such "liens" therefore are not "valid liens" under the Uniform Fraudulent Conveyance Act. Moreover, any such "liens" were not valid liens because they

"secured" equity investments rather than valid loans and for this reason as well any such purported "liens" should be avoided and negated.

149.     Accordingly, MacLean was paid on September 18, 2008, on an antecedent debt owed to him by LRN with a transfer of assets on which MacLean did not hold a "valid lien" as defined under the applicable Uniform Fraudulent Transfer Act. See, e.g., 740 ILCS 106/2(m); 6 Del. C. § 1301(13).

150.     As previously indicated in paragraph 127, on or about September 18, 2008, defendant Risk received in Illinois $1 million in cash from the sale proceeds of the Bosch transaction.

151.     The $1 million payment to Risk on September 18, 2008, was not made with assets that were subject to a "valid lien" as defined under the applicable Uniform Fraudulent Conveyance Act. See, e.g., 740 ILCS 106/2(m); 6 Del. C. § 1301(13).

152.     Any purported liens granted to Risk in June, 2007, or otherwise, are avoidable as fraudulent and such "liens" therefore are not "valid liens" under the Uniform Fraudulent Conveyance Act. Moreover, any such "liens" were not valid liens because they "secured" equity investments rather than valid loans and for this reason as well any such purported "liens" should be avoided and negated.

153.     Accordingly, Risk was paid on September 18, 2008, on an antecedent debt owed to him by LRN with a transfer of assets on which Risk did not hold a "valid lien" as defined under the applicable Uniform Fraudulent Transfer Act. See, e.g., 740 ILCS 106/2(m); 6 Del. C. § 1301(13).

154.     On September 18, 2008, LRN, Bosch, Ransburg, Risk and MacLean entered into the Turf Receivables Agreement. This agreement addressed the manner in which payments

received by Bosch after September 18, 2008, for accounts receivable attributable to LRN's "Turf division" ("the Turf Receivables") would be handled. Pursuant to the terms of the Turf Receivables Agreement, Bosch agreed to collect, identify and segregate all amounts collected on the Turf Receivables for the benefit of Risk and MacLean.

155.    Bosch further agreed to transfer directly all amounts collected on the Turf Receivables to an account at Harris Trust & Savings Bank in Illinois in the name of Risk, MacLean and LRN.

156.    Bosch was aware that Risk and MacLean were being paid on the Risk Investment and the MacLean Investment, with funds collected on the Turf Receivables.

157.    Bosch was aware that Rubbermaid was not being paid on its claim as asserted in the then-pending North Carolina Action, and was also aware that LRN's firm liability to Rubbermaid for already-earned royalties under the License was in excess of $3 million and that a judgment in Rubbermaid's favor is excess of $3 million was highly likely.

158.    Bosch was aware that LRN was, or would be rendered, insolvent by virtue of the Bosch transaction, including the transfer of all sums collected on the Turf Receivables to and for the benefit of Risk and MacLean.

159.    For some period after September 18, 2008, and continuing through at least March 2009, payments made on the Turf Receivables were subsequently transferred to or for the benefit of MacLean and Risk. These transfers were made even though Risk and MacLean had already released any purported liens on the Purchased Assets.

160.    MacLean and Risk did not hold a "valid lien" on the Turf Receivables as any purported lien granted to them on such assets in June, 2007, had already been released and/or was an avoidable fraudulent transfer. Moreover, any such "liens" were not valid liens because

they "secured" equity investments rather than valid loans and for this reason as well any such purported "liens" should be avoided and negated.

161.    On or about March 6, 2009, the China Closing finally occurred, as a result of which Bosch paid LRN a net amount of approximately $2.3 million for the transfer of LRN's Nelson-China Assets to Bosch.

162.    As a result of the China Closing, Defendant MacLean received from LRN in Illinois on March 6, 2009, approximately $819,500.00 in cash paid to LRN for LRN's Nelson-China Assets.

163.    Defendant MacLean released any and all security interests he previously held, or purported to hold, in the Purchased Assets (including LRN's Nelson-China Assets) and their sale proceeds on or before September 23, 2008.

164.    Therefore, when MacLean was paid $819,500.00 on March 6, 2009, MacLean did not have a perfected or unperfected security interest in either LRN's Nelson-China Assets or their cash proceeds.

165.    Accordingly, MacLean was paid on March 6, 2009, on an antecedent debt owed to him by LRN with a transfer of assets on which MacLean *did not hold any lien* on LRN's assets, much less a "valid lien" as defined under the applicable Uniform Fraudulent Transfer Act. See, e.g., 740 ILCS 106/2(m); 6 Del. C. § 1301(13). Moreover, even if MacLean had a lien in place at that time on assets of LRN, any such purported lien was avoidable as fraudulent and is not a "valid lien" under the Uniform Fraudulent Conveyance Act.

166.    On or about March 6, 2009, Defendant Risk also received from LRN in Illinois $819,500.00 in cash paid to LRN for LRN's Nelson-China Assets.

167.    Defendant Risk released any and all security interests he previously held, or purported to hold, in the Purchased Assets (including LRN's Nelson-China Assets) and their sale proceeds on or before September 23, 2008.

168.    Therefore, when Risk was paid $819,500.00 on March 6, 2009, Risk did not have a perfected or unperfected security interest in either LRN's Nelson-China Assets or their cash proceeds.

169.    Accordingly, Risk was paid on March 6, 2009, on an antecedent debt owed to him by LRN with a transfer of assets on which Risk *did not hold any lien* on LRN's assets, much less a "valid lien" as defined under the applicable Uniform Fraudulent Transfer Act. See, e.g., 740 ILCS 106/2(m); 6 Del. C. §1301(13). Moreover, even if Risk had a lien in place at that time on assets of LRN, any such purported lien was avoidable as fraudulent and/or as "securing" equity investments rather than valid loans, and is not a "valid lien" under the Uniform Fraudulent Conveyance Act.

170.    Sometime after March 6, 2009, LRN transferred at least an additional $250,000.00 to Risk and MacLean.

171.    Neither Risk nor MacLean held any perfected or unperfected security interest in the LRN assets transferred to each of them after March 6, 2009, which totaled at least $250,000.00.

172.    Accordingly, Risk and MacLean were paid at least an additional $250,000.00, after March 6, 2009, on antecedent debts owed to them by LRN with a transfer of assets on which neither Risk or MacLean held a "valid lien" as defined under the applicable Uniform Fraudulent Transfer Act. See, e.g., 740 ILCS 106/2(m); 6 Del. C. §1301(13). Moreover, even if Risk and MacLean had liens in place at that time on assets of LRN, any such purported liens

were avoidable as fraudulent and/or as "securing" equity investments rather than valid loans, and are not "valid liens" under the Uniform Fraudulent Conveyance Act.

173.   On or about March 6, 2009, Defendant Ransburg received in Illinois approximately $695,000.00 in cash paid to LRN for LRN's Nelson-China Assets.

174.   Defendant Ransburg released any and all security interests he previously held, or purported to hold, in the Purchased Assets (including LRN's Nelson-China Assets) and their sale proceeds on or before September 23, 2008.

175.   As more fully alleged in paragraphs 243-253 below, LRN, controlled by Ransburg, granted Ransburg a new lien in LRN's assets on October 9, 2008, which was documented with a UCC-1 filing made on October 13, 2008.

176.   Ransburg's October, 2008 purported lien did not attach to the Purchased Assets (including LRN's Nelson-China Assets) or their sale proceeds.

177.   Even if the lien did purport to attach to the Purchased Assets (including LRN's Nelson-China Assets or their sale proceeds), the lien should be avoided as fraudulent under the Uniform Fraudulent Conveyance Act and as alleged more fully herein.

178.   Therefore, when Ransburg was paid on March 6, 2009, Ransburg did not have a perfected or unperfected security interest in either LRN's Nelson-China Assets or their cash proceeds.

179.   Accordingly, Ransburg was paid on March 6, 2009, on an antecedent debt owed to him by LRN with a transfer of assets on which Ransburg did not hold a "valid lien" as defined under the applicable Uniform Fraudulent Transfer Act. See, e.g., 740 ILCS 160/2(m); 6 Del. C. § 1301(13).

180.    These cash transfers from LRN were made to the Insiders at a time when LRN was insolvent and/or rendered LRN insolvent as a result.

181.    By filing purported liens against LRN's assets as described herein, the Insiders were seeking to enrich themselves and to conceal from legitimate creditors like Rubbermaid the fraudulent purposes of their expected and contemplated transfers, and they did so in an improper attempt to claim protection for the fraudulent and preferential transfers described herein.

182.    Any liens granted to the Insiders (at the Insiders' direction) are, for these reasons and others to be established as discovery proceeds in this action, avoidable as fraudulent transfers of an interest in LRN.

183.    Curiously, even though LRN received significant cash payments in addition to having virtually all of its liabilities assumed or satisfied (with the glaring exception of LRN's obligation to Rubbermaid), LRN now claims it has no cash and holds only limited contingent assets of an unknown value.  LRN therefore claims it cannot make any payment on the Judgment entered against it.

184.    Other than admitting that certain Insiders have collected more than $4 million in cash from the Bosch and Signature Control transactions, LRN has refused to disclose to Rubbermaid where the cash has gone or to whom it was distributed.

185.    Instead, LRN purports to now be an insolvent shell (holding only contingent, disputed, unliquidated assets), while the LRN Business is now conducted by Bosch.

### Bosch Continues to Operate the LRN Business

186.    Upon closing the first phase of the LRN/Bosch transaction on September 18, 2008, Bosch immediately commenced operating the business of L.R. Nelson Corporation, with the exception of the insubstantial "Turf division" (the assets of which were sold to Signature

Control), uninterrupted ("the LRN Business"). Bosch did so in a seamless manner as if no transaction had occurred.

187.   Upon conveying the LRN Business to Bosch, LRN immediately ceased operating or conducting any business other than winding up its affairs.

188.   Bosch continues presently to operate the LRN Business at the same physical plant in Peoria, Illinois, with the same telephone numbers.

189.   With the exception of chairman Ransburg, all or substantially all of the former LRN employees were hired by Bosch and operate the same business at the same location.  (*See* LRN/Bosch Agreement.)

190.   The LRN Business is conducted under the L.R. Nelson name and trademarks.

191.   The LRN Business manufactures and sells the same products.

192.   The website, www.lrnelson.com, continues to be used.

193.   There has been no substantial change to the company's sales and distribution system.

194.   The LRN Business continues to be operated with the same equipment, machinery and tooling.

195.   The very same LRN executives who, along with some or all of the Insiders, controlled LRN, who negotiated the sale of assets to Bosch, who refused to pay Rubbermaid, and who threatened to render LRN insolvent, now continue to manage and control the LRN Business for Bosch. These executives received payment on their "stay bonuses."

196.   Certain of these LRN executives were shareholders in LRN.

197.   Upon information and belief, certain of these LRN executives, in connection with the LRN/Bosch transaction, have received and/or been granted options or other rights to acquire

equity in the publicly-traded parent corporation of Bosch and/or in other affiliated entities of Bosch.

198.    All key management employees (other than Ransburg) were offered employment at Bosch and continue to manage the LRN Business in such capacities, including LRN's: President and Chief Operating Officer, Vice President of Finance and Chief Financial Officer, President of Global Operations, President of Consumer Products/Sunterra, Vice President of Sales, Vice President of Human Resources, Chief Information Officer, Directors of Marketing, Managing Director of Nelson Asia, Director of Engineering, Business Applications Systems Manager, and Director of Sales Analysis/Forecasting.  (LRN/Bosch Agreement at § 4.7(b) and Exhibit D thereto.)

199.    Bosch operates the LRN Business with the same intellectual property.

200.    Bosch has held itself out to third parties and the public as LRN.

201.    In fact, one of LRN's secured third-party lenders views Bosch and LRN as the same entity that only went through a name change.

202.    Farnam Street Financial, Inc. ("Farnam") initially took a lien on LRN's leased assets on September 13, 2005, perfected with a UCC-1 filing in Delaware.

203.    On November 5, 2008, Farnam filed an amendment to its financing statement reflecting a name change of the borrower or lessee from L.R. Nelson Corporation to Robert Bosch Tool Corporation.

204.    As alleged above in paragraphs 120-25, and 161, Bosch was delayed by Chinese regulatory and other issues from immediately taking possession of LRN's Nelson-China Assets in September, 2008.

205.    LRN and Bosch expected that the portion of the LRN/Bosch transaction related to LRN's Nelson-China Assets would close sometime in December, 2008.  However, this part of the transaction did not close until March 6, 2009.

206.    Bosch and LRN therefore worked out a deal pursuant to which Bosch leased LRN's Nelson-China facility from LRN for the period commencing September 18, 2008 until LRN's Nelson-China Assets could be conveyed at the China Closing.

207.    Bosch then operated the LRN Business in part out of LRN's facility in China, while leaving those China assets still technically in LRN's name and title.

208.    Additionally, Bosch made sure that LRN's liabilities related to the operation of LRN's Nelson-China facility were being kept current during the period of September, 2008 until March, 2009.

209.    Specifically, in the Fall of 2008, LRN was unable to pay a third-party freight-forwarding vendor, believed to be Marisol International.

210.    To make sure that Marisol International continued to provide services for the benefit of LRN's Nelson-China operation, in December, 2008, Bosch loaned LRN $298,511.25 to resolve LRN's debt to Marisol.

211.    The purchase agreement between LRN and Bosch reflects that LRN was conveying all Business Contracts to Bosch.  (LRN/Bosch Agreement § 1.1(c).)

212.    LRN and Bosch agreed, however, that LRN was excluding from the sale the rights under *only one* of its contracts:  "All *rights* of Seller with respect to that certain License Agreement, dated October 7, 2005, between Rubbermaid Incorporated and L.R. Nelson Corporation."  (LRN/Bosch Agreement Schedule 1.2(k).)

213.    At the time Bosch purchased the LRN Business, Bosch was aware of the pending litigation with Rubbermaid, which was expressly disclosed in the Purchase Agreement. (LRN/Bosch Agreement Schedule 2.14.)

214.    Bosch was also obviously aware of the Rubbermaid License as it expressly stated that it was not purchasing the rights associated with such contract.

215.    Bosch was aware of the extent of LRN's liability to Rubbermaid and had reviewed the License prior to entering into the LRN/Bosch Agreement. Bosch was also aware that LRN's liability to Rubbermaid for already-earned minimum royalties under the License was in excess of $3 million, and that it was highly likely Rubbermaid would obtain a judgment against LRN in excess of $3 million in the North Carolina Action.

216.    Bosch was aware at the time of the Bosch transaction that LRN was insolvent or would be rendered insolvent by the sale of substantially all of LRN's assets.

217.    Bosch was aware that the Insiders would receive a portion of the purchase price paid for LRN's assets.

218.    Bosch in fact participated in paying Risk and MacLean a portion of the purchase price over time in accordance with the requirements of the Turf Receivables Agreement, an amount believed to be in excess of $250,000.00.

219.    Bosch was aware that Rubbermaid's claim would not be paid by LRN or assumed by Bosch.

220.    Bosch did not enter into the LRN/Bosch agreement in good faith.

221.    Bosch intended to hinder, delay and defraud Rubbermaid when it consented to the distribution of the purchase price, agreed not to assume or otherwise satisfy the Rubbermaid debt, and directly paid the Insiders on their claims ahead of Rubbermaid.

**Post-Closing of the LRN/Bosch Transaction, the Insiders
Wind up LRN's Affairs for Their Exclusive Benefit With An Intent to
Hinder, Delay and Defraud LRN's Bona Fide Creditors Including Rubbermaid**

222.    With the exception of winding up its affairs, LRN ceased all business operations after the closing of the LRN/Bosch transaction and the Signature Control transaction on September 18 and 19, 2008.

223.    Since Bosch and Signature Control hired virtually all of LRN's employees, after September 19, 2008, LRN did not have any employees or officers other than Ransburg.

224.    By LRN's own description, since September 19, 2008, LRN is merely an insolvent corporate shell which retained certain limited contingent assets and which does not conduct any business.

225.    After September 19, 2008, Ransburg has continued to be the substantial majority shareholder of LRN. Upon information and belief, Risk and MacLean continue to be shareholders as do certain of Ransburg's family members.

226.    Since September 19, 2008, LRN has been an insolvent corporate shell that has been operated and controlled by Ransburg.

227.    Ransburg has controlled LRN for his own personal benefit and that of preferred insiders including Risk and MacLean, to the detriment of Rubbermaid who is LRN's largest remaining creditor.

228.    Since September 19, 2008 and continuing to the present, Ransburg has been the dominant, if not exclusive, decision-maker, serving as LRN's chairman, president, chief executive officer, director, and principal shareholder.

229.    Since at least September 19, 2008, Ransburg has dominated LRN.

230.    Since at least September 19, 2008, LRN, at Ransburg's direction and under his control, has failed and refused to make payments to legitimate creditors, including Rubbermaid.

231.    LRN, under Ransburg's control, has failed and refused to make any payment to Rubbermaid on the Judgment.

232.    Since at least September 19, 2008, Ransburg has manipulated LRN, and has disregarded the corporate form, for the intended purposes of:  (a) diverting LRN's remaining assets to himself and other preferred insiders, including Risk and MacLean, (b) avoiding payments to LRN's legitimate creditors, including Rubbermaid, and (c) obstructing the collection efforts of LRN's legitimate creditors, including Rubbermaid. Risk and MacLean, and perhaps other shareholders, have participated in, benefited from, encouraged, and/or acquiesced in Ransburg's manipulation, misuse, and disregard of the corporate form.

233.    While refusing to pay Rubbermaid or to even make any efforts to satisfy such obligation in installments or otherwise, Ransburg has repeatedly siphoned money from LRN for himself and for other preferred insiders of LRN, including Risk and MacLean.

234.    Ransburg has also used LRN and its corporate form in a fraudulent effort to create the illusion that he is supposedly owed money by LRN for alleged "loans" he supposedly made to LRN subsequent to September 19, 2008.

235.    As part of this sham, Ransburg has conveyed to himself purported "security interests" in LRN's assets for his alleged "loans."  Then, when LRN receives a subsequent payment that Ransburg was expecting it to receive, Ransburg has promptly paid himself some or all of those LRN funds as alleged repayments of his so-called "loans," and has paid other preferred insiders, including Risk and MacLean, all to the detriment of LRN's legitimate creditors such as Rubbermaid.

236.   To facilitate this unjust result, and despite the obvious conflicts of interest, Ransburg has used his personal lawyer at Elias, Meginnes, Riffle & Seghetti on both sides of the "loans" and "security interests" to himself, and has paid said counsel for these and other personal matters out of LRN funds, again disregarding the corporate form.

237.   Ransburg's misuse of LRN's corporate form after September 18, 2009, is evidenced by, among other things, his actions in late 2008 and early 2009 with respect to the large cash payments LRN was then imminently expecting from:   (a) LRN's settlement in December, 2008, of a pending lawsuit captioned:   *L.R. Nelson Corporation v. Great American Ins. Co., et al.,* Case No. 06-1252 (C.D. Ill.)(the "Great American Action"); and (b) the China Closing which was expected by Ransburg to take place in December, 2008, but which actually closed on March 6, 2009.

238.   LRN commenced the Great American Action on September 5, 2006.

239.   On or about October 5, 2005, LRN agreed to pay a significant settlement amount to a third party, Orbit Irrigation Products ("Orbit"), in a patent lawsuit then pending in federal district court in Utah.

240.   LRN's liability in this patent litigation was the source of two subsequent lawsuits. One of these actions was the Great American Action, pursuant to which LRN sought to recover from its insurers for settlement payments made to Orbit and for costs and expenses incurred by LRN in the Orbit litigation. LRN also sued another insurance carrier in the Great American Action, Fireman's Fund, but LRN settled with Fireman's Fund and its claims against Fireman's Fund were accordingly dismissed on or about April 17, 2008. It is believed that LRN received some payment in exchange for the agreed dismissal of Fireman's Fund.  LRN also sued its legal counsel in the Orbit litigation for malpractice in an action captioned:  *L.R. Nelson Corporation v.*

*Mayer Brown, et al.,* 05-L-461 (Peoria, Illinois)(the "Mayer Brown Action"), which is still pending.

241.    On or about September 22, 2008, LRN received a very favorable decision from the federal court in the Great American Action.  In fact, the court in the Great American Action *invited* LRN to file for summary judgment in its favor.  As a result of this ruling, it was therefore apparent to LRN and to Ransburg that LRN would likely be able to settle the Great American Action for a substantial cash payment to LRN.

242.    Just after the closing of the transactions with Bosch and Signature Control in September, 2008, LRN and Ransburg were also expecting to receive in December 2008 at least an additional $2.3 million cash payment from Bosch in connection with the anticipated China Closing.

243.    On or around October 9, 2008, and with full knowledge that LRN was expected to soon be receiving millions of dollars in cash from an anticipated settlement with Great American and from the China Closing, Ransburg caused LRN to issue a promissory note in his sole favor in the amount of $1.5 million (and perhaps other promissory notes).

244.    The LRN promissory note dated October 9, 2008 in Ransburg's favor was signed by Ransburg himself.

245.    On or around October 9, 2008, Ransburg also caused LRN to enter into a so-called "security agreement" (and perhaps other "security agreements") in which he was awarded a purported security interest in LRN's assets, including specifically any sums that might eventually be recovered by LRN in the Great American Action, and liens on LRN's equipment, machinery, tangible property, accounts receivable, inventory, investment property, intellectual property, and proceeds, including insurance proceeds.

246.    The "security agreement" by which Ransburg caused LRN to grant him a security interest in LRN's assets was also signed by Ransburg himself.

247.    This "secured loan" was purportedly made by Ransburg just weeks after LRN sold substantially all of its assets to Bosch and Signature Control.

248.    LRN was insolvent when it granted a security interest to Ransburg in October, 2008.

249.    Ransburg knew that LRN was insolvent in October, 2008.

250.    Moreover, this security interest, which Ransburg tried to perfect with a UCC-1 filing on October 13, 2008, purported to re-take liens in the very assets that Ransburg had just released his interests in on September 16, 2008.  Ransburg had filed a UCC amendment releasing all of his liens in the Purchased Assets (including LRN's Nelson-China Assets) on September 23, 2008.  Curiously, he then sought to reclaim a lien in presumably those same assets just weeks later.

251.    In fact, the alleged "loan" of October, 2008, was not a loan at all.  Ransburg did not at that time or thereafter provide to LRN some or all of the cash reflected in the documents purporting to memorialize his alleged October "loan," and, even to the extent that he did provide some cash in whole or in part to LRN, any cash he provided to LRN at that time or thereafter was not a "loan," was provided solely to advance his own personal interests, was equity, and/or was not entitled to be treated as a "loan."

252.    The "security interest" he caused LRN to award to him in October, 2008, is likewise a sham.  Ransburg was not entitled to any security interest as a result of his alleged "loan."  Any liens alleged to exist in his favor as a result of that purported "security interest" are invalid and fraudulent as to Rubbermaid, and should be avoided.

253.     Ransburg knowingly and intentionally used the artifice of the purported "loan" and "security agreement" in order to create the illusion, just weeks before LRN was expected to receive substantial cash payments from Great American and Bosch, that he was a legitimate creditor of LRN when he was not.  This facilitated Ransburg's plan to siphon off for himself a substantial amount of the Great American settlement proceeds and the proceeds from the China Closing, to the detriment of LRN's legitimate creditors, including Rubbermaid.

254.     After the favorable ruling in the Great American Action on September 22, 2008, LRN, controlled by Ransburg, engaged in settlement discussions with Great American.  The parties entered into a settlement agreement in December, 2008.  Ransburg participated in these settlement discussions and was the ultimate decision-maker for LRN in them. The settlement in favor of LRN involved a cash payment to LRN, which, upon information and belief, was well in excess of $1 million.

255.     As a result of the settlement, the Great American Action was dismissed with prejudice by stipulation on December 22, 2008.

256.     Upon LRN's receipt of the Great American Action settlement proceeds in or about December, 2008, and perhaps of other cash LRN received at that time from other sources, Ransburg, upon information and belief, caused some or all of those funds to be paid to himself as the purported "repayment" of his bogus "loans," all to the detriment of LRN's legitimate creditors including Rubbermaid.

257.     To Ransburg's dismay, the China Closing was delayed until March, 2009.  This delay meant that Ransburg's plans to divert funds from the China Closing to himself were delayed too.

258.    A mediation conference was held in the North Carolina Action on February 16, 2009.  At this mediation, LRN was represented by Ransburg and his and the company's legal counsel at Elias, Meginnes, Riffle & Seghetti.  The mediation conference did not result in a settlement of the North Carolina Action.

259.    With a firm trial date scheduled for May, 2009 in the North Carolina Action, the parties continued on their own to engage in settlement discussions subsequent to the mediation conference. LRN and Ransburg concealed from Rubbermaid that LRN was expecting to close on LRN's Nelson-China Assets in March 2009. LRN and Ransburg concealed from Rubbermaid that the Insiders intended to collect personally all of the more than $2.3 million Bosch was paying for those assets.

260.    During this same time frame in February 2009, Ransburg was also expecting LRN to receive, on or about April 2, 2009, a payment of up to $2 million from an escrow account that had been set up on or about September 18, 2008, at U.S. Bank National Association ("U.S. Bank") as part of the LRN/Bosch transaction.

261.    The escrow account was funded on or about September 18, 2008, by LRN and Bosch with $2 million of the Bosch purchase price paid for the assets acquired in the LRN/Bosch transaction.  By February, 2009, with the escrow funds still sitting in the escrow account at U.S. Bank, LRN and Ransburg had concluded that, unless Bosch made a proper written demand for some portion of the escrowed funds by the parties' agreed contractual deadline of March 31, 2009, all of the escrowed $2 million was to be immediately paid to LRN.  Ransburg believed that Bosch would fail to properly make an escrow demand prior to the March 31, 2009 deadline and that, in any event, LRN was at least entitled to approximately $1.3 million of the escrowed funds.

262.    In February, 2009, Ransburg therefore was expecting that the escrow funds up to $2 million would be paid to LRN on April 2, 2009.

263.    Ransburg again intended to divert some or all of these imminently expected funds to himself, again to the detriment of LRN's legitimate creditors including Rubbermaid.

264.    LRN and Ransburg concealed from Rubbermaid that they were then expecting a payment of up to $2 million from the escrow account to be made to LRN on April 2, 2009, and concealed that Ransburg's intention was to take this money for himself as "repayment" on his "loans."

265.    By February 16, 2009, Ransburg knew that Rubbermaid was not going to settle the North Carolina Action for a nominal amount. Ransburg also knew that: (a) the May, 2009 trial date in the North Carolina Action would not be changed; (b) Rubbermaid was pushing hard toward the trial and was preparing for trial, while LRN was not and could not prepare for trial; (c) LRN had no legitimate defenses to Rubbermaid's claims; (d) a judgment in favor of Rubbermaid and against LRN in excess of $3 million was substantially certain; and (e) LRN was likely to have such a judgment entered against it by default or otherwise on or before the end of May, 2009.

266.    Fully aware of the imminent expected influxes of more than $4 million to LRN and recognizing the risk of Rubbermaid successfully seeking to attach some of those funds, Ransburg on February 26, 2009, caused LRN to issue him at least one more promissory note (and perhaps others) in his favor.  LRN, under Ransburg's control, agreed to pay Ransburg $2 million.

267.    Ransburg also caused LRN to grant him a security interest in all of LRN's assets, and recorded a UCC-1 financing statement reflecting such liens on February 27, 2009.

268.    Ransburg signed the February 2009 note on behalf of LRN obliging the company to pay himself $2 million.  Ransburg also signed the February 2009 security agreement on behalf of LRN granting himself a security interest in LRN's assets.

269.    The alleged "loan" of February, 2009 was not a loan at all.  Ransburg did not at that time or thereafter provide to LRN some or all of the cash reflected in the documents purporting to memorialize his alleged "loan." Even to the extent that Ransburg did contribute some cash to LRN, any cash provided at that time was not a loan, but was provided solely to advance his own personal interests, was equity, and/or was not entitled to be treated as a "loan."

270.    The security interest Ransburg caused LRN to grant him in February, 2009 is likewise a sham.  Ransburg was not entitled to any security interest as a result of his alleged "loan."

271.    Any liens alleged to exist in Ransburg's favor based on the February, 2009 grant of a "security interest" are invalid and fraudulent as to Rubbermaid.

272.    Ransburg knowingly and intentionally used the artifice of the purported "loan" and "security agreement" to create the illusion, just weeks before he was expecting LRN to receive millions of dollars from the closing on LRN's Nelson-China Assets and the recovery from the Bosch/LRN escrow account, that he was a legitimate creditor of LRN when he was not, thereby facilitating his plan to siphon off for himself a substantial amount of the proceeds of the closing of LRN's Nelson-China Assets and of the distribution from the Bosch/LRN escrow fund, all to the detriment of LRN's legitimate creditors including Rubbermaid.

273.    When, *just 7 days* after Ransburg's purported $2 million loan, LRN was paid more than $2.3 million for LRN's Nelson-China Assets, Ransburg stood poised to seek "repayment" on his sham secured "loan."

274.    Thus, upon LRN's receipt on March 6, 2009, of the proceeds for the sale of LRN's Nelson-China Assets, Ransburg caused at least $695,000.00 of such funds to be paid directly to him as "repayment" of his bogus "loans."   Ransburg was not entitled to any such payments until LRN's legitimate creditors, including Rubbermaid, were paid in full.

275.    Ransburg has not yet been successful, as of this filing, in his efforts to divert for his own benefit the $2 million escrow account at U.S. Bank.  Bosch has opposed any release of the escrow funds and claims Bosch is entitled to take such funds.  As a result of these disputes, LRN, Bosch and U.S. Bank are presently in pending litigation in Illinois state court over the payment and distribution of these escrowed funds.

276.    Because of the pending escrow litigation, the $2 million is still in the escrow account and has not been paid out to either party.  Nevertheless, any funds LRN may in the future receive from these escrowed funds or the litigation regarding them are funds that Ransburg intends for LRN to pay to himself as "repayments" on his improper "loans" and in accordance with his invalid "security interests," all to the detriment of LRN's legitimate creditors, including Rubbermaid.

277.    On July 16, 2009, LRN and Ransburg personally sued Windlake to seek to recover the $1,226,340.00 fee that Windlake was paid to broker the LRN/Bosch transaction on the basis that the broker was not properly licensed under Illinois law.  *LRN Holding, Inc., et al. v. Windlake Capital Advisors, LLC,* Case No. 09 L 230 (Peoria County, Illinois Circuit Court).  In this pending action, Ransburg seeks to personally recover the fee paid out of the Bosch purchase price.  Ransburg again seeks to ignore any distinction between himself and LRN, and again seeks to take any recovery of the corporation for his sole personal benefit to the direct detriment of LRN's bona fide creditors, including Rubbermaid.

278.    Rubbermaid first brought its claims against all defendants by filing, on September 15, 2009 (against the Insiders), and on September 17, 2009 (against Bosch), motions under Rules 25(c) and/or 69 of the Federal Rules of Civil Procedure seeking to join these defendants as additional parties in post-judgment proceedings in the North Carolina Action in which Rubbermaid obtained its judgment against LRN. These motions were voluntarily withdrawn by Rubbermaid without prejudice on November 23, 2009.

279.    All conditions precedent to defendants' joint and several liability to Rubbermaid, and to Rubbermaid's right to recover from said defendants, have been performed or have occurred.

### COUNT I – Insider Preferences

### Against Defendants MacLean, Risk, Ransburg, and Doe(s)

280.    Rubbermaid incorporates herein each and every statement and allegation set forth in paragraphs 1 through 279 of this Amended Complaint as if fully rewritten here.

281.    Defendants MacLean, Risk, Ransburg, and/or Doe(s) are "Insiders" as defined under all potentially relevant statutes, because as of the date of the challenged transfers each of them was a director of LRN. See, e.g., 6 Del. C. § 1301(7)(b); 740 ILCS 160/2(g)(2); N.C. Gen. Stat. § 39-23.1(7)(b).

282.    Defendants MacLean, Risk, Ransburg, and/or Doe(s) are also "Insiders" as defined under all potentially relevant statutes, because as of the date of the challenged transfers each of them was an officer and/or a person in control of LRN. See, e.g., 6 Del. C. § 1301(7)(b); 740 ILCS 160/2(g)(2) ); N.C. Gen. Stat. § 39-23.1(7)(b).

283.    Commencing on or about September 18, 2008, and continuing for some period thereafter until the present, LRN made transfers to the Insiders on debts owed to the Insiders which were incurred prior to the date of such transfers.

284.    As alleged more fully above, LRN transferred $1 million each to Risk and MacLean on or about September 18, 2008.

285.    After September 18, 2008, and continuing through at least March, 2009, LRN transferred the proceeds of the Turf Receivables to Risk and MacLean.

286.    On or about March 6, 2009, LRN transferred $819,500.00 of proceeds from the sale of LRN's Nelson-China Assets to Risk.

287.    On or about March 6, 2009, LRN transferred $819,500.00 of proceeds from the sale of LRN's Nelson-China Assets to MacLean.

288.    On or about March 6, 2009, LRN transferred $695,000.00 of proceeds from the sale of LRN's Nelson-China Assets to Ransburg.

289.    After March 6, 2009, LRN transferred at least an additional $250,000.00 in cash to Risk and MacLean.

290.    Upon information and belief, LRN has made additional transfers of its assets to the Insiders commencing on September 18, 2008 until the present.

291.    All such transfers by or on behalf of LRN were payments on an antecedent debt owed to the Insiders.

292.    The debt owed to Rubbermaid arose prior to the transfers made in or after September, 2008.

293.    All transfers made to the Insiders by or on behalf of LRN, commencing on or around September 18, 2008, and continuing thereafter, were made at a time when LRN was insolvent and/or rendered LRN insolvent.

294.    Defendants MacLean, Risk, Ransburg, and/or Doe(s) each had reasonable cause to believe that LRN was insolvent at the time of such transfers.

295.    The transfers were not made in the ordinary course of business.

296.    The Insiders did not give LRN new value after the transfers were made.

297.    The transfers were not made in good faith.

298.    None of the assets transferred to the Insiders commencing in September, 2008, were subject to valid liens held by the Insiders, because, among other reasons, all liens granted in favor of the Insiders were fraudulent transfers that should be avoided.

299.    Risk, MacLean and Ransburg each released any liens they held or purported to hold in the Purchased Assets on September 16 and 23, 2008.

300.    Accordingly, all assets transferred after September 23, 2008, were not subject to *any* lien, let alone a "valid lien" in favor of any of the Insiders.

301.    To the extent any Insider still seeks to assert any lien in the assets transferred after September 23, 2008, such "liens" are not valid because, among other reasons, such "liens":  (1) are not perfected with a UCC filing, (2) were not granted in exchange for bona fide loans, (3) were improperly made to secure equity investments and not loans, and/or (4) are avoidable as fraudulent transfers themselves.

302.    Accordingly, all such transfers to defendants MacLean, Risk, Ransburg and/or Doe(s) are fraudulent as to creditor Rubbermaid whose claim arose prior to such transfers.

303.    Such transfers should be either:  (1) avoided and returned to LRN for distribution to Rubbermaid on its Judgment; (2) attached for the benefit of Rubbermaid; or, (3) made available to Rubbermaid for levy on its Judgment.

304.    Alternatively, judgment should be entered against each of defendants MacLean, Risk, Ransburg, and/or Doe(s) in the amount of any fraudulent transfers received by them.

305.    Moreover, Rubbermaid has been damaged by the tortious acts and omissions of MacLean, Risk, Ransburg and/or Doe(s) as alleged herein in an amount to be determined at trial, but substantially in excess of $75,000.00 exclusive of interest and costs. Rubbermaid is also entitled to costs, pre- and post-judgment interest, and reasonable attorney fees.

### COUNT II - Fraudulent Transfer with Intent to Hinder, Delay or Defraud

### Against MacLean, Risk, Ransburg, and Doe(s)

306.    Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 305 of this Amended Complaint as if fully rewritten here.

307.    The transfers LRN made to each of Defendants MacLean, Risk, Ransburg, and/or Doe(s) commencing in June, 2007 until the present were made with an actual intent to hinder, delay or defraud Rubbermaid. See, e.g., 6 Del. C. § 1304 (a)(1); 740 ILCS 160/5(a)(1) ); N.C. Gen. Stat. § 39-23.4(a)(1).

308.    Defendants MacLean, Risk, Ransburg, and/or Doe(s) are "Insiders" as defined under all potentially relevant statutes, because as of the date of the challenged transfers each of them was a director of LRN.  See, e.g., 6 Del. C. § 1301(7)(b); 740 ILCS 160/2(g)(2) N.C. Gen. Stat. § 39-23.1(7)(b).

309.    Defendants MacLean, Risk, Ransburg, and/or Doe(s) are also "Insiders" as defined under all potentially relevant statutes, because as of the date of the challenged transfers

each of them was an officer and/or a person in control of LRN. See, e.g., 6 Del. C. § 1301(7)(b);

740 ILCS 160/2(g)(2); N.C. Gen. Stat. § 39-23.1(7)(b).

310.    Such transfers include, without limitation:  (1) the grants of security interests in
favor of the Insiders commencing in June, 2007, and continuing to the present; (2) the transfers
of other LRN assets to the Insiders prior to September, 2008; (3) the transfers to the Insiders on
or about September 18, 2008; (4) the transfers to Risk and MacLean on the Turf Receivables as
collected, commencing on September 18, 2008 through at least March, 2009; (5) the transfers to
the Insiders on March 6, 2009, of the sale proceeds of LRN's Nelson-China Assets; (6) the
transfers to Ransburg or any other Insider of the proceeds of the settlement proceeds in the Great
American Action; and/or (7) any other fraudulent transfers made to the Insiders during the four-
year statute of limitations period.

311.    Each of such transfers was made to or for the benefit of an Insider.

312.    Each of such transfers was concealed from Rubbermaid at a time when
Rubbermaid was owed substantial sums by LRN and/or was attempting to collect on the amounts
owed to it by LRN.

313.    LRN had been sued by Rubbermaid in March, 2007, prior to the June, 2007 grants
of avoidable security interests in favor of the Insiders.

314.    LRN had been sued again by Rubbermaid in March, 2008, long before the
transfers were made commencing in September, 2008, in March, 2009, and continuing until the
present.

315.    The transfers of LRN's assets in September, 2008, constituted a transfer of
substantially all of the debtor's assets.

316.    The transfers of LRN's assets were not made in the ordinary course of business.

317.     LRN was insolvent or became insolvent shortly after the transfers were made or the obligations were incurred.

318.     LRN transferred funds or granted liens to the Insiders at their direction.

319.     The transfers to Insiders were made without any exchange for equivalent value, and such transfers were made when LRN was insolvent or rendered it insolvent while the Rubbermaid litigation was pending.

320.     The Insiders did not give LRN new value after such transfers.

321.     LRN threatened Rubbermaid that it would find a way to avoid paying on any judgment rendered in Rubbermaid's favor.

322.     The Insiders facilitated that result and authorized the Bosch and Signature Control transactions, which included substantial payments to themselves ahead of LRN's bona fide creditor in Rubbermaid as well as releases of their guarantee obligations and/or pledges of personal assets in favor of Wells Fargo.

323.     The Insiders did not want to pay Rubbermaid and wanted to realize on their investment in this financially struggling entity.  They structured their transactions with Bosch and Signature Control such that they could get paid ahead of Rubbermaid.

324.     The Insiders planned, since at least June, 2007, to sell the company and sought to structure their investments in the insolvent LRN, including granting and seeking to perfect liens in their favor, in a manner that would allow them to collect ahead of Rubbermaid on its bona fide debt.

325.     The Insiders concealed material facts from Rubbermaid to induce Rubbermaid to forbear from taking a judgment against LRN, to forbear from terminating the License, and to forbear from collection on its Judgment.

326.    The Insiders therefore acted with the intent to hinder, delay or defraud Rubbermaid.

327.    The transfers were not made in good faith.

328.    The Insiders concealed the existence of certain LRN assets to deter Rubbermaid from seeking to collect against such assets on its claim and/or judgment.

329.    Accordingly, all such transfers to defendants MacLean, Risk, Ransburg and/or Doe(s) are fraudulent as to creditor Rubbermaid whose claim arose prior to such transfers.

330.    Such transfers should be either:  (1) avoided and returned to LRN for distribution to Rubbermaid on its Judgment; (2) attached for the benefit of Rubbermaid; or, (3) made available to Rubbermaid for levy on its Judgment.

331.    Alternatively, judgment should be entered against each of defendants MacLean, Risk, Ransburg, and/or Doe(s) in the amount of any fraudulent transfers received by them.

332.    Moreover, Rubbermaid has been damaged by the tortious acts and omissions of MacLean, Risk, Ransburg and/or Doe(s) as alleged herein in an amount to be determined at trial, but substantially in excess of $75,000.00 exclusive of interest and costs. Rubbermaid is also entitled to costs, pre- and post-judgment interest, and reasonable attorney fees.

### COUNT III - Fraudulent Transfers Not Made in Good Faith

### Against Defendants MacLean, Risk, Ransburg, and Doe(s)

333.    Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 332 of this Amended Complaint as if fully rewritten here.

334.    The transfers LRN made to each of Defendants MacLean, Risk, Ransburg, and/or Doe(s) commencing in June, 2007 until the present were not made in good faith and are therefore avoidable by Rubbermaid as fraudulent.

335.    Defendants MacLean, Risk, Ransburg, and/or Doe(s) are "Insiders" as defined under all potentially relevant statutes, because as of the date of the challenged transfers each of them was a director of LRN. See, e.g., 6 Del. C. § 1301(7)(b); 740 ILCS 160/2(g)(2); N.C. Gen. Stat. § 39-23.1(7)(b).

336.    Defendants MacLean, Risk, Ransburg and/or Doe(s) are also "Insiders" as defined under all potentially relevant statutes, because as of the date of the challenged transfers each of them was an officer and/or a person in control of LRN. See, e.g., 6 Del. C. § 1301(7)(b); 740 ILCS 160/2(g)(2); N.C. Gen. Stat. § 39-23.1(7)(b).

337.    Each of such transfers was therefore made to or for the benefit of an Insider.

338.    LRN was insolvent or became insolvent shortly after the transfers were made or the obligations were incurred.

339.    The transfers were not made in the ordinary course of business.

340.    LRN transferred funds or granted liens to the Insiders at their direction.

341.    The transfers to Insiders were made without any exchange for equivalent value, and such transfers were made when LRN was insolvent or rendered it insolvent while the Rubbermaid litigation was pending.

342.    The Insiders did not give LRN new value after the transfers.

343.    Even if the transfers were made for reasonably equivalent value, they are still avoidable, because they were not made in good faith.

344.    LRN threatened Rubbermaid that it would find a way to avoid paying on any judgment rendered against it.

345.    The Insiders facilitated that result and authorized the Bosch and Signature Control transactions, which included substantial payments to themselves ahead of LRN's bona fide

creditor in Rubbermaid as well as releases of their guarantee obligations and/or pledges of personal assets in favor of Wells Fargo.

346.   The Insiders did not want to pay Rubbermaid and wanted to realize on their investment in this financially struggling entity.   They made sure that they structured their transactions with Bosch and Signature Control such that they could get paid ahead of Rubbermaid.

347.   The Insiders therefore did not act in good faith when authorizing the Bosch and Signature Control transactions and directing transfers for their own benefit to the direct detriment of existing creditor Rubbermaid.

348.   Accordingly, all such transfers to defendants MacLean, Risk, Ransburg, and/or Doe are fraudulent as to creditor Rubbermaid whose claim arose prior to such transfers.

349.   Such transfers should be either:  (1) avoided and returned to LRN for distribution to Rubbermaid on its Judgment; (2) attached for the benefit of Rubbermaid; or, (3) made available to Rubbermaid for levy on its Judgment.

350.   Alternatively, judgment should be entered against each of defendants MacLean, Risk, Ransburg, and/or Doe(s) in the amount of any fraudulent transfers received by them.

351.   Moreover, Rubbermaid has been damaged by the tortious acts and omissions of MacLean, Risk, Ransburg and/or Doe(s) as alleged herein in an amount to be determined at trial, but substantially in excess of $75,000.00 exclusive of interest and costs. Rubbermaid is also entitled to costs, pre- and post-judgment interest, and reasonable attorney fees.

## COUNT IV – Insider Debt Recharacterization

### Against Defendants MacLean, Risk and Ransburg

352.    Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 351 of this Amended Complaint as if fully rewritten here.

353.    Commencing in September, 2006, Ransburg purported to make a series of loans to LRN on a subordinated basis.  In connection with Ransburg's purported extension of credit to the corporation in which he owns 90% of the shares, LRN granted a series of liens in favor of Ransburg.

354.    After closing the Bosch transaction and the Signature Control transaction, on October 9, 2008 and again on February 26, 2009, Ransburg purportedly loaned LRN additional funds and directed LRN to grant him additional security interests in all of LRN's remaining assets at a time when LRN was insolvent.

355.    Commencing in June, 2007, defendants MacLean and Risk purported to loan money to LRN in Illinois on a subordinated basis. In connection with their subordinated loans, LRN purported to grant MacLean and Risk security interests in its assets located in Illinois.

356.    None of the loans made to LRN by Ransburg, MacLean or Risk required principal payments and/or such provisions were not honored or enforced.

357.    None of the maturity dates in the loans made to LRN by Ransburg, MacLean or Risk were honored or enforced.

358.    None of the loans made to LRN by Ransburg, MacLean or Risk required any payments on principal over the course of the loan and/or and such requirements were not enforced.

359.    To the extent interest payments were required, such payments were not fully honored over the course of the loan, if at all.

360.    The "loans" did not provide for commercially reasonable rates of interest and instead gave the Insiders additional benefits from their self-dealing in the form of excessive interest.

361.    LRN was not adequately capitalized when the "loans" were made by the Insiders to LRN.

362.    Each of MacLean, Ransburg and Risk were directors and shareholders of LRN at the time each "loan" was made by them to LRN. Additionally, defendant Ransburg was the Chairman of LRN for all relevant time periods and its only remaining employee after September, 2008, when LRN continued to "borrow" funds from Ransburg and grant him security interests in exchange.

363.    Upon information and belief, LRN was unable to obtain financing from outside lending institutions at the time LRN executed subordinated promissory notes in favor of the Insiders.

364.    Each of the "loans" made by the Insiders were expressly subordinated by agreement to LRN's outside lenders.

365.    LRN did not have a sinking fund to provide for repayment of the purported loans from Insiders and/or any such sinking fund was not active.

366.    All or some of the "loans" made by the Insiders and the related grants of security interests by LRN occurred at a time when LRN was insolvent and/or LRN was rendered insolvent as a result.

367.    Each of the "loans" made by MacLean, Risk and Ransburg, were, in fact, capital contributions to LRN and not loans.

368.    Each of the grants of security interests made in connection with such "loans" are fraudulent and avoidable as such, rendering every Insider loan unsecured if treated as a loan at all.

369.    Each of the Insider loans should be recharacterized as equity contributions and/or as unsecured loans made by each of the Insiders.

### COUNT V – Equitable Subordination

**Against Defendants MacLean, Risk and Ransburg**

370.    Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 369 of this Amended Complaint as if fully rewritten here.

371.    Commencing in September, 2006, Ransburg purported to make a series of loans to LRN on a subordinated basis.  In connection with Ransburg's purported extension of credit to the corporation in which he owns 90%, LRN granted a series of liens in favor of Ransburg.

372.    After closing the Bosch transaction and the Signature Control transaction, on October 9, 2008 and again on February 26, 2009, Ransburg purportedly loaned LRN additional funds and directed LRN to grant him additional security interests in all of LRN's remaining assets at a time when LRN was insolvent.

373.    Commencing in June, 2007, defendants MacLean and Risk purported to loan money to LRN in Illinois on a subordinated basis. In connection with their subordinated loans, LRN purported to grant MacLean and Risk security interests in its assets located in Illinois.

374.    None of the loans made to LRN by Ransburg, MacLean or Risk required principal payments and/or such provisions were not honored or enforced.

375.    None of the maturity dates in the subordinated promissory notes in favor of the Insiders were honored or enforced.

376.    Further, none of the maturity dates in such subordinated promissory notes were honored or enforced.

377.    LRN was not adequately capitalized when the "loans" were made by the Insiders to LRN.

378.    Each of MacLean, Ransburg and Risk were directors and shareholders of LRN at the time each "loan" was made by them to LRN.  Additionally, defendant Ransburg was the Chairman of LRN for all relevant time periods and its only remaining employee after September, 2008, when LRN continued to "borrow" funds from Ransburg and grant him security interests in exchange.

379.    Upon information and belief, LRN was unable to obtain financing from outside lending institutions at the time LRN executed subordinated promissory notes in favor of the Insiders.

380.    LRN did not have a sinking fund to provide for repayment of the purported loans from Insiders and/or any such sinking fund was not active.

381.    All or some of the "loans" made by the Insiders and the related grants of security interests by LRN occurred at a time when LRN was insolvent and/or LRN was rendered insolvent as a result.

382.    Each of the "loans" made by MacLean, Risk and Ransburg, were, in fact, capital contributions to LRN and not loans.

383.    Each of the grants of security interests made in connection with such "loans" are fraudulent and avoidable as such, rendering every Insider loan unsecured if treated as a loan at all.

384.    The "loans" and related security interests were entered into as a result of the Insiders' breaches of their fiduciary duties to the creditors of LRN at a time when it was insolvent and/or rendered it insolvent.

385.    The Insiders misused their positions as Insiders to the intended disadvantage of certain of LRN's creditors, including Rubbermaid, in connection with the extension of such loans, grants of security interests, and repayments of their loans, all at a time when LRN was insolvent or was rendered insolvent as a result.

386.    As a result of this fraudulent and inequitable conduct by the Insiders, Rubbermaid was injured and the Insiders' "loans" should in equity be subordinated to Rubbermaid's Judgment.

## COUNT VI - Equitable Trust

### Against Defendants MacLean, Risk and Ransburg

387.    Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 386 of this Amended Complaint as if fully rewritten here.

388.    Defendants MacLean, Risk and Ransburg were each a shareholder and a director of LRN in September, 2008.

389.    Commencing at least in September, 2008, until the present, LRN was insolvent and/or was rendered insolvent by the transfers LRN made to defendants MacLean, Risk and Ransburg.

390.    Any transfers by LRN to MacLean, Risk and/or Ransburg commencing in September 2008 until the present are liquidating distributions of LRN's assets.

391.    Rubbermaid was a known creditor of LRN in September, 2008, who has received no payment on the debt owed to it by LRN.

392.    Defendants MacLean, Risk and Ransburg hold any LRN assets distributed to them in trust for the benefit of the corporation's creditors, including Rubbermaid.

393.    As shareholders and/or directors in LRN, Defendants MacLean, Risk and Ransburg remain jointly and severally liable to Rubbermaid as an existing creditor of the corporation to the full extent of the corporate property these defendants each received.

## COUNT VII - Civil Conspiracy

### Against All Defendants

394.    Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 393 of this Amended Complaint as if fully rewritten here.

395.    The Insiders agreed with LRN to structure transactions with LRN for their own benefit and that of other third parties to the intended detriment of Rubbermaid. This agreement was made and acted upon during the period from in or about September 2006 and continuing through the present, as alleged in detail throughout this Amended Complaint.

396.    The Insiders conspired with each other, LRN and other third parties, for the unlawful purpose of hindering, delaying and/or defrauding Rubbermaid, including without limitation the fraudulent conveyances and preferences made in connection with the Bosch and Signature Control transactions.

397.    In furtherance of such agreement, the Insiders agreed to direct LRN to transfer its assets to the Insiders for their own benefit and with the purpose of evading LRN's debt to Rubbermaid.

398.    In furtherance of such agreement, the Insiders also agreed to direct LRN to pay off certain corporate debts ahead of Rubbermaid for the purpose of reducing the Insiders' liability related to such obligations.

399.    Bosch agreed with LRN and the Insiders to structure a transaction with LRN for the benefit of the Insiders and that of other third parties to the intended detriment of Rubbermaid. Bosch made this agreement and acted upon it during the period from in or about August 2008 and continuing through March 2009, when the China Closing occurred. In furtherance of this agreement, Bosch, among other things, allowed the Rubbermaid liability to be left in an insolvent shell, agreed to and/or facilitated transfers of LRN's assets to persons known to be "insiders" under applicable fraudulent conveyance law and did so in circumstances where Bosch knew or should have known that any purported "liens" held by the Insiders were released, invalid and/or fraudulent.

400.    Bosch collected the Turf Receivables on behalf of the Insiders, identifying, segregating and transferring the proceeds directly to the Insiders, thereby allowing LRN and the Insiders to shield and conceal such assets from its legitimate creditors, including Rubbermaid.

401.    Bosch conspired with LRN, the Insiders and other third parties, for the unlawful purpose of hindering, delaying and/or defrauding Rubbermaid, including without limitation agreeing to the fraudulent conveyances and preferences made in connection with the Bosch transaction.

402.    In furtherance of such agreement, Bosch agreed to a transfer of substantially all of LRN's assets to Bosch in exchange for certain consideration which Bosch was aware would be conveyed to the Insiders despite the prior debt of Rubbermaid.  Moreover, Bosch participated in the transfer of LRN's assets to Bosch which was not made in good faith.  As such, Bosch is a transferee of these fraudulently conveyed assets.

403.    On March 6, 2009, Bosch paid LRN at least $2.3 million for LRN's Nelson-China Assets.  On that date, Bosch was aware of LRN's intent, and consented to, the subsequent payment by LRN of $819,500.00 each to Risk and MacLean and $695,000.00 to Ransburg from the sale proceeds.

404.    Bosch was aware that Risk, MacLean and Ransburg had released their liens on LRN's Nelson-China Assets and sale proceeds on September 16 and 23, 2008.

405.    Bosch was aware that LRN was insolvent on March 6, 2009, or would be rendered insolvent by the transaction closed on that date, including the transfers of $2.3 million to the Insiders.

406.    Bosch was aware that any liens Ransburg claimed to have in LRN's Nelson-China Assets and their sale proceeds would have been granted and perfected by LRN, an insolvent shell, at a time when Ransburg was controlling the non-operating entity purely for his own benefit and that of other Insiders.

407.    Bosch was aware that on March 6, 2009, LRN owed Rubbermaid in excess of $3 million and would not be paid with the any of the sale proceeds of LRN's Nelson-China Assets, because they were all being distributed to the Insiders.

408.    In furtherance of this civil conspiracy, at least some of the conspirators committed overt tortious or unlawful acts, all as more fully alleged above and in Counts I, II, and III of this Amended Complaint.

409.    Each of the conspirators knowingly and substantially assisted in the fraudulent transfers and other tortious and unlawful acts.

410.    Accordingly, the Insiders and Bosch are liable to Rubbermaid in the amount of the Judgment on the basis of a common law claim for civil conspiracy to commit fraud and fraudulent transfers.

411.    Moreover, Rubbermaid has been damaged by the tortious acts and omissions of the Insiders and Bosch as alleged herein in an amount to be determined at trial but substantially in excess of $75,000.00 exclusive of interest and costs. Rubbermaid is also entitled to costs, pre- and post-judgment interest, and reasonable attorney fees.

## COUNT VIII – Aiding and Abetting

### Against All Defendants

412.    Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 411 of this Amended Complaint as if fully rewritten here.

413.    LRN made fraudulent transfers to or for the benefit of the Insiders.

414.    As more fully alleged in Counts I, II and III of this Amended Complaint, such transfers include, without limitation, the conveyance to the Insiders of:  (1) $2 million in sale proceeds on September 18, 2008; (2) amounts Bosch collected, identified, segregated and subsequently transferred to the Insiders directly on the Turf Receivables, after September 18, 2008, and continuing through at least March 2009; (3) the conveyance on March 6, 2009, of at

least $2.3 million to the Insiders; and (4) the transfer of at least an additional $250,000.00 to Risk and MacLean after March 6, 2009.

415.    The Insiders and Bosch caused LRN to make some or all of such fraudulent transfers to the Insiders and/or aided some or all of such fraudulent transfers.

416.    The Insiders and Bosch were each aware at the time of the transfers that some or all of such transfers were fraudulent and were each aware of their respective roles when providing the assistance and/or aid.

417.    The Insiders and Bosch knowingly and substantially assisted LRN in making the fraudulent transfers.

418.    On March 6, 2009, Bosch paid LRN at least $2.3 million for LRN's Nelson-China Assets.  On that date, Bosch was aware of LRN's intent, and consented to, the subsequent payment by LRN of $819,500.00 each to Risk and MacLean and $695,000.00 to Ransburg from the sale proceeds.

419.    Bosch was aware that Risk, MacLean and Ransburg had released their liens on LRN's Nelson-China Assets and sale proceeds on September 16 and 23, 2008.

420.    Bosch was aware that LRN was insolvent on March 6, 2009, or would be rendered insolvent by the transaction closed on that date, including the transfers of $2.3 million to the Insiders.

421.    Bosch was aware that any liens Ransburg claimed to have in the Nelson-China Assets and their sale proceeds would have been granted and perfected by LRN, an insolvent shell, at a time when Ransburg was controlling the non-operating entity purely for his own benefit and that of other Insiders.

422.     Bosch was aware that on March 6, 2009, LRN owed Rubbermaid in excess of $3 million and would not be paid with the any of the sale proceeds of LRN's Nelson-China Assets, because they were all being distributed to the Insiders.

423.     Accordingly, the Insiders and Bosch are liable to Rubbermaid in the amount of the Judgment on the basis of a common law claim for aiding and abetting fraudulent transfers. Moreover, Rubbermaid has been damaged by the tortious acts and omissions of the Insiders and/or Bosch as alleged herein in an amount to be determined at trial, but substantially in excess of $75,000.00 exclusive of interest and costs. Rubbermaid is also entitled to costs, pre- and post-judgment interest, and reasonable attorney fees.

## COUNT IX – Alter Ego / Veil Piercing

### Against Defendants Ransburg, Risk and MacLean

424.     Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 423 of this Amended Complaint as if fully rewritten here.

425.     From September 18-19, 2008 to the present, Ransburg has dominated and controlled LRN, and misused the corporate form, such that LRN is now merely his alter ego. Since at least September 19, 2008, Ransburg has manipulated LRN, and has disregarded the corporate form, for the intended purposes of: (a) diverting LRN's remaining assets to himself and other preferred insiders, including Risk and MacLean, (b) avoiding payments to LRN's legitimate creditors, including Rubbermaid, and (c) obstructing the collection efforts of LRN's legitimate creditors, including Rubbermaid.

426.     Under the facts and circumstances of this case, to be developed more fully at trial, adherence to the fiction of any alleged, but non-existent, separate corporate existence of LRN would produce an unjust or inequitable result, and it would reward Ransburg's knowing and

intentional misuse of the corporate form in order to enrich himself and other preferred insiders including Risk and MacLean to the detriment of LRN's largest legitimate creditor, Rubbermaid.

427.     Ransburg's misuse of LRN's corporate form is evidenced, in among other ways, by his actions beginning on and after September 18-19, 2008, and continuing through the present, as detailed in, for example, paragraphs 98-103 and 222-277 of this Amended Complaint, which are incorporated herein.

428.     Because of these and other reasons, as set out above in this Amended Complaint, there is now such a unity of interest and ownership that the separate personalities of LRN and Ransburg no longer exist, and that adherence to the fiction of LRN's separate corporate existence would sanction a fraud or promote injustice.

429.     Ransburg has used LRN to unjustly enrich himself, by purportedly paying off "loans" to himself that are not in actuality loans at all, and to otherwise take LRN's money for himself.  He has done so as part of an intentional scheme to squirrel away the remaining assets form LRN, thereby rendering LRN insolvent and judgment proof as to Rubbermaid, and improperly diverting those remaining assets to himself and other preferred insiders who have no legitimate right to be paid ahead of LRN's creditors, including Rubbermaid.

430.     Corporate formalities have not been properly observed by LRN since at least September 19, 2008.

431.     The officers and directors have not been properly functioning since at least September 19, 2008.

432.     This is evidenced by, among other things to be more fully developed in discovery, Ransburg's practice of himself signing on behalf of LRN for the large promissory notes and related security agreements issued by LRN for his sole benefit.

433.    Similarly, despite conflicts of interest, Ransburg and LRN are repeatedly being represented by the same counsel for both corporate and personal matters.

434.    Since at least September 19, 2008, LRN has been operated as if it shares an identity with Ransburg and for the sole benefit of LRN's Insiders, to the direct detriment of the corporation's bona fide creditors.

435.    Ransburg now uses LRN as an instrumentality to conduct his own personal business, and to enrich himself and other preferred insiders, all at the expense of the corporation's legitimate creditors including Rubbermaid and at a time when LRN purports to be insolvent and unable to pay its legitimate creditors.

436.    Ransburg's receipt of money from LRN under the circumstances described in this Amended Complaint, and as to be more fully developed by Rubbermaid in discovery once Ransburg ceases his obstruction of Rubbermaid's post-judgment discovery efforts, has occurred in circumstances that, in equity and good conscience, suggest that it ought not to be retained because it belongs to someone else, to wit, Rubbermaid and perhaps other legitimate creditors of LRN.

437.    Risk and MacLean, and perhaps other shareholders of LRN, have participated in, benefited from, encouraged, and/or acquiesced in Ransburg's manipulation, misuse, and disregard of the corporate form.

438.    Under applicable law, the corporate veil of LRN should accordingly be "pierced" in order to hold Ransburg, Risk, and MacLean (and perhaps other shareholders of LRN) liable jointly and severally with LRN for the Rubbermaid Judgment.

## COUNT X – Fraudulent Transfer

### Against Defendant Bosch

439.　Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 423 of this Amended Complaint as if fully rewritten here.

440.　On or about September 18, 2008, LRN conveyed substantially all of the assets of the LRN Business to Bosch.

441.　On or about September 18, 2008, Rubbermaid was a creditor of LRN whose claim arose long before such date pursuant to a contract between Rubbermaid and LRN entered into in 2005.

442.　LRN's conveyance of its assets and failure to satisfy the debt of Rubbermaid with the proceeds of such transaction was done with an intent to hinder, delay or defraud Rubbermaid.

443.　Bosch was aware of the Rubbermaid debt, the North Carolina Action, and the License.

444.　Bosch knew which of LRN's creditors, directors, and shareholders would be paid with proceeds of the transaction.

445.　Bosch was aware that Rubbermaid's debt would not be assumed or satisfied in the transaction. Bosch is a direct competitor of companies that are affiliates of Rubbermaid.

446.　Bosch was aware that the Insiders would receive transfers of the sales proceeds and/or would have their guarantees of corporate debt and/or pledges of personal assets released in connection with the Bosch transaction.

447.　Bosch was aware that LRN was conveying its assets to Bosch and distributing the sale proceeds received with an intent to hinder, delay or defraud Rubbermaid.

448.    Bosch knew that as of September 18, 2008, LRN was insolvent or would be rendered insolvent by its transaction with Bosch.

449.    Bosch did not act in good faith when it negotiated, structured and entered into the Purchase Agreement with LRN, aware that such transaction would render LRN insolvent and that Rubbermaid's debt would not be paid.

450.    Bosch entered into the transaction with LRN with an intent to hinder, delay or defraud Rubbermaid.

451.    The transfers to Bosch and to the Insiders were not made in the ordinary course of business.

452.    LRN was not given new value after the challenged transfers.

453.    Bosch is a transferee of LRN's fraudulent transfer of its assets.

454.    Accordingly, the transfer of LRN's assets to Bosch should be either:  (1) avoided and returned to LRN to the extent necessary for satisfaction of Rubbermaid's Judgment, including any part of $2 million in the escrow account at U.S. Bank that has been or might in the future be paid to Bosch; (2) attached for the benefit of Rubbermaid; or, (3) made available to Rubbermaid for levy on its Judgment.

455.    Alternatively, judgment should be entered against defendant Bosch in the amount of any fraudulent transfers received by Bosch to the extent necessary to satisfy Rubbermaid's Judgment, including the $2 million in the escrow account at U.S. Bank.

456.    Moreover, Rubbermaid has been damaged by the tortious acts and omissions of Bosch as alleged herein in an amount to be determined at trial but substantially in excess of $75,000.00 exclusive of interest and costs. Rubbermaid is also entitled to costs, pre- and post-judgment interest, and reasonable attorney fees.

## COUNT XI – Successor Liability

### Against Defendant Bosch

457.     Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 423, and 440-456 of this Amended Complaint as if fully rewritten here.

458.     As alleged above, in September, 2008, Bosch stepped into LRN's shoes as to the LRN Business and commenced operating the LRN Business seamlessly. LRN immediately ceased operating.

459.     Bosch operates from the same location, with the same equipment and intellectual property, with the same employees and management team (excepting only Ransburg), with the same assets, and manufactures and sells the same products.

460.     Bosch assumed all of LRN's liabilities necessary for the uninterrupted continuation of the LRN Business.

461.     Bosch and LRN agreed to isolate out Rubbermaid's debt and refused to make any payment on such debt as part of the transaction, despite the fact that the overwhelming majority of the company's debts were being paid or assumed, including payments of more than $5 million to LRN's Insiders.

462.     The same executives and shareholders who threatened to render LRN a shell now manage the LRN Business for Bosch. Upon information and belief, at least some of these LRN executives and shareholders, as part of the LRN/Bosch transaction, received or were granted options or other rights to acquire equity in the publicly-traded parent corporation of Bosch and/or in other affiliated entities of Bosch.

463.     The LRN/Bosch transaction amounted to a consolidation or de facto merger.

464.     Bosch is a mere continuation of the LRN Business.

465. LRN fraudulently entered into the Bosch transaction with the purpose of evading its liability to Rubbermaid.

466. Bosch did not enter into the LRN/Bosch transaction in good faith.

467. Bosch is liable for the Rubbermaid Judgment as a successor-in-interest to LRN.

468. Moreover, Rubbermaid has been damaged by the tortious acts and omissions of Bosch as alleged herein in an amount to be determined at trial, but substantially in excess of $75,000.00 exclusive of interest and costs. Rubbermaid is also entitled to costs, pre- and post-judgment interest, and reasonable attorney fees.

## COUNT XII – Post-Judgment Relief

### Against All Defendants

469. Rubbermaid incorporates each and every statement and allegation set forth in paragraphs 1 through 468 of this Amended Complaint as if fully rewritten here.

470. As a judgment creditor with a valid and enforceable federal court money judgment, Rubbermaid is, additionally and/or alternatively, entitled to invoke and rely upon any and all available applicable procedures to enforce and collect upon the Judgment from those persons or entities liable or potentially liable to Rubbermaid on the Judgment, including but not limited to those procedures set forth in the Federal Rules of Civil Procedure, e.g., Rules 25(c) and/or 69.

471. For all of the reasons previously set forth in this Amended Complaint, Bosch, LRN, MacLean, Risk, Ransburg, and Doe(s) are each persons or entities liable or potentially liable to Rubbermaid on the Judgment.

472. Accordingly, in seeking to enforce and collect upon its Judgment, Rubbermaid is, additionally and/or alternatively, entitled to invoke and rely upon against Bosch, LRN, MacLean,

Risk, Ransburg, and Doe(s) any and all such available applicable post-judgment procedures including but not limited to those procedures set forth in the Federal Rules of Civil Procedure, e.g., Rules 25(c) and/or 69.

WHEREFORE, Rubbermaid demands that judgment be entered against Bosch, LRN, MacLean, Risk, Ransburg, and/or Doe(s), and in favor of Rubbermaid as follows:

A. On each of Counts I, II, and III, together and/or alternatively, for an order that the subject transfers should be either: (1) avoided and returned to LRN for distribution to Rubbermaid on its Judgment, (2) attached for the benefit of Rubbermaid, or, (3) made available to Rubbermaid for levy on its Judgment; alternatively, judgment should be entered against each of MacLean, Risk, Ransburg, and/or Doe(s) in the amount of any fraudulent transfers received by them; and for an award of compensatory damages in favor of Rubbermaid and against MacLean, Risk, Ransburg, and/or Doe(s), jointly and severally, in an amount to be determined at trial, but substantially in excess of $75,000.00 exclusive of interest and costs.

B. On Count IV, additionally and/or alternatively, for an order that each of the Insider loans made to MacLean, Risk, Ransburg, and/or Doe(s), as identified herein, should in equity be recharacterized as equity contributions made by each of MacLean, Risk, Ransburg, and/or Doe(s), and that such amounts shall accordingly be made available to satisfy the Rubbermaid's Judgment, and such other equitable relief in favor of Rubbermaid on its claim for insider debt recharacterization as the Court may deem just and appropriate.

C. On Count V, additionally and/or alternatively, for an order that each of the Insider loans made to MacLean, Risk, Ransburg, and/or Doe(s), as identified herein, should

in equity, as a result of the fraudulent and inequitable conduct by MacLean, Risk, Ransburg, and/or Doe(s), be subordinated to Rubbermaid's Judgment, and such other equitable relief in favor of Rubbermaid on its claim for equitable subordination as the Court may deem just and appropriate.

D. On Count VI, additionally and/or alternatively, for an order that, as shareholders and/or directors in LRN, MacLean, Risk and Ransburg are jointly and severally liable to Rubbermaid as an existing creditor of LRN to the full extent of the corporate property these defendants each received, and such other equitable relief in favor of Rubbermaid on its claim for an equitable trust as the Court may deem just and appropriate.

E. On Count VII, additionally and/or alternatively, for an order that Bosch, MacLean, Risk, Ransburg, and/or Doe(s) are jointly and severally liable to Rubbermaid in the full amount of the Judgment on the basis of a common law claim for civil conspiracy to commit fraud and fraudulent transfers, and for an award of compensatory damages in favor of Rubbermaid and against Bosch, MacLean, Risk, Ransburg, and/or Doe(s), jointly and severally, in an amount to be determined at trial but substantially in excess of $75,000.00 exclusive of interest and costs.

F. On Count VIII, additionally and/or alternatively, for an order that Bosch, MacLean, Risk, Ransburg, and/or Doe(s) are jointly and severally liable to Rubbermaid in the amount of the Judgment on the basis of a common law claim for aiding and abetting fraudulent transfers, and for compensatory damages in favor of Rubbermaid and against Bosch, MacLean, Risk, Ransburg, and/or Doe(s), jointly and severally, in an

amount to be determined at trial, but substantially in excess of $75,000.00 exclusive of interest and costs.

G. On Count IX, additionally and/or alternatively, for an order that the Ransburg has, since September 18, 2008, dominated and controlled LRN, and misused the corporate form, to such an extent that LRN is now merely his alter ego, that the corporate veil of LRN should be "pierced," and that Ransburg, Risk and MacLean are thus liable jointly and severally with LRN for the Rubbermaid Judgment.

H. On Count X, additionally and/or alternatively, for an order that the subject transfers should be either: (1) avoided and returned to LRN for distribution to Rubbermaid on its Judgment, (2) attached for the benefit of Rubbermaid, or, (3) made available to Rubbermaid for levy on its Judgment; alternatively, judgment should be entered against Bosch in the amount of any fraudulent transfers received by it; and for an award of compensatory damages in favor of Rubbermaid and against Bosch in an amount to be determined at trial, but substantially in excess of $75,000.00 exclusive of interest and costs.

I. On Count XI, additionally and/or alternatively, for an order that Bosch is liable to Rubbermaid for the Rubbermaid Judgment as a successor-in-interest to LRN under the applicable law, and for compensatory damages in favor of Rubbermaid and against Bosch in an amount to be determined at trial, but substantially in excess of $75,000.00 exclusive of interest and costs.

J. On Count XII, additionally and/or alternatively, such orders as may be necessary and appropriate in favor of Rubbermaid, and against Bosch, LRN, MacLean, Risk, Ransburg, and Doe(s), to enforce and collect upon Rubbermaid's money judgment

against LRN, including such orders as may be necessary and/or appropriate under any counts in this Amended Complaint and under available applicable post-judgment procedures including but not limited to those set forth in the Federal Rules of Civil Procedure, e.g., Rules 25(c) and/or 69.

K.  For Rubbermaid's reasonable attorneys' fees, costs, and expenses of this action in an amount to be determined, all as may be allowed under applicable law.

L.  For pre- and/or post-judgment interest as may be allowed.

M.  For such other and further relief in favor of Rubbermaid as the Court may find just and appropriate.

Dated:  March 3, 2010                              Respectfully Submitted,


/s/ Timothy F. Sweeney
_____
Timothy F. Sweeney, Esq. (0040027)
Lynn Rowe Larsen, Esq. (0055824)
LAW OFFICE OF TIMOTHY FARRELL SWEENEY
The 820 Building, Suite 430
820 West Superior Ave.
Cleveland, Ohio    44113-1800
(216) 241-5003
(216) 241-3138 (fax)
tim@timsweeneylaw.com
lynn@timsweeneylaw.com

David A. Brown, Esq.
Black, Black & Brown
115 Washington Square
Washington, IL 61571
(309) 444-3108
(309) 444-3100 (fax)

Counsel for Rubbermaid Incorporated

## Jury Demand

Plaintiff Rubbermaid Incorporated demands a trial by jury on all issues and claims so triable.

/s/ Timothy F. Sweeney

Timothy F. Sweeney, Esq. (0040027)
One of the attorneys for Rubbermaid Incorporated

## CERTIFICATE OF SERVICE

I certify that, on March 3rd, 2010, PLAINTIFF'S FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND OTHER RELIEF was electronically filed with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following:

Michael P. Mayer
Dane A. Drobny
Amanda R. Conley
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601

Counsel for Defendants J. Fred Risk and Barry L. MacLean

Robert M. Riffle
Janaki H. Nair
ELIAS, MEGINNES, RIFFLE & SEGHETTI, P.C.
416 Main Street, Suite 1400
Peoria, Illinois 61602-1611

Counsel for Defendants LRN Corporation and David P. Ransburg

Stephen J. O'Neil
Dawn L. Johnson
K&L Gates LLP
70 West Madison Street, Suite 3100
Chicago, IL 60602-4207

Counsel for Defendant Robert Bosch Tool Corporation

Dated this 3rd day of March, 2010.

/s/ Timothy F. Sweeney

Timothy F. Sweeney
One of the Attorneys for Plaintiff